## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

| | | |
|---|---|---|
| **TEMPUR-PEDIC INTERNATIONAL, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 07-2015** |
| | : | |
| **WASTE TO CHARITY, INC.,** | : | |
| **BROCO SUPPLY, INC., JACK** | : | |
| **FITZGERALD, ERIC VOLOVIC,** | : | |
| **HOWARD HIRSCH, THOMAS** | : | |
| **SCARCELLO and NELSON SILVA,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER GRANTING *EX PARTE* TEMPORARY RESTRAINING ORDER

Before the Court is the Plaintiff Tempur-Pedic International, Inc.'s ("Tempur-Pedic")

Motion for Temporary Restraining Order filed on February 14, 2007.(Document #2 Filed in

this Case)  Tempur-Pedic seeks a temporary restraining order and a preliminary injunction

enjoining Defendants Waste to Charity, Inc. ("WtC"), Broco Supply, Inc. ("Broco"), Eric

Volovic, Howard Hirsch, Thomas Scarcello and Nelson Silva (hereinafter collectively as

"Defendants"), and their officers, affiliate companies, agents, servants, employees,

successors, licensees and assigns, and all others acting in concert and privy with them to

be enjoined and restrained from directly or indirectly moving, transporting, shipping, selling,

offering for sale, concealing, damaging, destroying or otherwise interfering with any Tempur-

Pedic mattresses pillows, slippers or other merchandise that is in the possession, custody

or control of each and every defendant, including each of their officers, affiliate companies,

agents, servants, employees, successors, licensees and assigns having been previously

donated by Tempur-Pedic to Separate Defendant Waste To Charity, Inc. for distribution for

Dockets.Justia.com

charitable purposes; and that each and every Defendant identify in writing to counsel for Plaintiff within five days of service of this Order the location of each item that constitutes Donated Property.  For the reasons set forth below, Tempur-Pedic's Motion is granted.

This dispute arises from alleged fraud, breach of contract, misappropriation, deceit and conversion of certain mattresses Tempur-Pedic donated to victims of Hurricane Katrina and others in need.  Tempur-Pedic asserts the Defendants have operated and continue to operate a scheme to defraud Tempur-Pedic by selling misappropriated mattresses for profit, below retail value and in contravention of the general purpose of Tempur-Pedic's donation of the goods. Tempur-Pedic further contends the Defendants, while defrauding Tempur-Pedic, are infringing upon Tempur-Pedic's authorized retailers' ability to sell the mattresses at the authorized and established retail value, thereby causing irreparable injury to Tempur-Pedic.   Tempur-Pedic is requesting a temporary restraining order to stop Defendants' alleged misappropriation, storage, distribution and sale of such donated products and what Tempur-Pedic claims is the incalculable and irreparable injury to its reputation and good will as well as the harm done to the public expecting receipt of Tempur-Pedic's donated goods.

## STATEMENT OF FACTS

On August 29, 2005, Hurricane Katrina struck the Gulf Coast.  On November 14, 2005, as part of its corporate relief efforts, Tempur-Pedic entered into a contract with WtC, wherein Tempur-Pedic would donate an unspecified number of goods (mattresses, pillows,

and slippers) ("Donated Goods") for the purpose of providing relief to victims of Hurricane Katrina and others in need.  In return and in consideration for these donations, WtC agreed to certain conditions and restrictions for the use of the donations.  The contract was styled a "Charitable Donation Agreement" and provided as follows:

> As a recipient of a Tempur-Pedic International, Inc. product donation, Waste to Charity, Inc. agrees to the following restrictions:
>
> > **All products donated by Tempur-Pedic are not to be resold, distributed for sale, or otherwise sold for profit in any venue.**
> >
> > All products donated by Tempur-Pedic are not covered by any warranties.
> >
> > All products donated by Tempur-Pedic are to be clearly identified as products manufactured by Tempur-Pedic in any promotional materials associated with the donation.
> >
> > All products donated by Tempur-Pedic are not to be used or portrayed in a disparaging way or otherwise portrayed in a negative light.
> >
> > **Should you wish to dispose of the Tempur-Pedic Products or any of them, you will notify us and give us an opportunity to retrieve them or designate their disposition, and you will comply with any reasonable request from us for their disposition**.
>
> **Recipients of Tempur-Pedic donated products will comply with terms initially discussed during donation proposal**.

Tempur-Pedic asserts it relied reasonably on WtC's representation that it would distribute the mattresses to victims of Hurricane Katrina and others, and therefore, between late 2005 and October 2006, Tempur-Pedic made approximately 50 deliveries of donated goods to WtC.   However, Tempur-Pedic contends that the Donated Goods were not making their way to the needy, but were being misappropriated and sold for profit in violation of the Charitable Donation Agreement.  The Affidavit of Johnny Cagle, Director, Internal Audit for Tempur-Pedic, Inc. describes how Tempur-Pedic became aware the Donated Goods were being redirected to those not affiliated with Katrina and other relief efforts.

Tempur-Pedic manufactures, sells and markets premium mattresses, pillows, cushions, slippers and other similar comfort products through a network of authorized and approved retail distributors. Each Tempur-Pedic mattress model references the TEMPUR-PEDIC® mark in its name. Tempur-Pedic sells its products through the network of authorized dealers to ensure its products are sold by reputable, professional retailers who have received training on the proper methods for handling and storing Tempur-Pedic products.

When authorized retailers sell Tempur-Pedic mattresses during the ordinary course of business, they are wrapped in a zip-on, hypo allergenic cloth cover and packed in cardboard boxes clearly labeled with Tempur-Pedic's markings. Per Tempur-Pedic, since the donated mattresses were not intended for sale, or to be placed into the stream of commerce, they were individually wrapped in heavy-duty clear plastic, stacked on wooden pallets, and then wrapped again in another layer of clear, heavy-duty plastic. The mattresses and other items were packaged in this distinctive fashion to distinguish them from those goods that would be sold in the ordinary manner through Tempur-Pedic's retail network. Tempur-Pedic used this unique packaging specifically and exclusively for shipping mattresses to WtC for charitable distribution.

As detailed by Cagle, not long after the Donated Goods were shipped to WtC, Tempur-Pedic became aware of a number of individuals and corporate entities (indeed, unapproved retailers) storing and offering Tempur-Pedic mattresses for sale. Examples of such discoveries include a November 2006 discovery of mattresses being sold from a truck located in Nashville, Tennessee and a warehouse in Bowling Green, Kentucky. Upon news of these locations, Cagle traveled to the warehouse in Bowling Green and made a visual

inspection of the premises.  There, Cagle observed Tempur-Pedic mattresses stacked in the identical fashion to those Tempur-Pedic products entrusted to WtC to be donated.  Per Tempur-Pedic, it is understood this warehouse was being operated as a commercial storage facility with no affiliation with charitable organizations working to aid hurricane victims.

After inspecting the warehouse in Bowling Green, Cagle contacted Jack Fitzgerald, President of WtC, and informed him of this discovery.  Although Fitzgerald acknowledged WtC forwarded donated slippers to the Bowling Green Warehouse (to eventually be placed with appropriate charitable organizations), he claimed no knowledge of the mattresses being distributed or stored at the Bowling Green Warehouse.

On Thursday, November 8, 2006, Cagle further discovered, through a news article appearing in the *Rocky Mountain News*, that 70 Tempur-Pedic mattresses had been given to a QuickDrop (a delivery facility for the sale of property over the Internet) store in Highlands Ranch, Colorado for sale on eBay.  Photographs accompanying the article revealed palletized and shrink-wrapped mattresses, wrapped in identical fashion to those forwarded to WtC for distribution to Katrina victims.  See Docket No. 05-, Exhibit 3.  From these photographs, Cagle could identify a particular shipping number that had been assigned to an allotment of seventy (70) mattresses Tempur-Pedic provided to WtC on July 28, 2006.  From this information, Cagle attests the mattresses originated from a Greenville, South Carolina Tempur-Pedic facility, which were shipped to WtC for distribution to charitable relief organizations aiding Katrina victims.

In the fall of 2006, an authorized retailer of Tempur-Pedic mattresses was solicited over the telephone by a representative of Defendant Broco Supply ("Broco"), a building material wholesaler/importer, operating in Mechanicsburg, Pennsylvania.  Tempur-Pedic

asserts that a sales representative from Broco, identified as Separate Defendant Eric Volovic, offered him 25 truckloads, or 3,300 Tempur-Pedic mattresses for a value of $295 per mattress.  However, Tempur-Pedic mattresses usually retail from $699 to $639 per mattress.  Tempur-Pedic subsequently discovered the mattresses offered by Broco were packaged in an identical manner to those forwarded to WtC for distribution pursuant to the Charitable Donation Agreement.

Broco's solicitation for the sale of 3,300 Tempur-Pedic mattresses prompted Cagle to again contact Fitzgerald of WtC to inquire about such.  Per Cagle, this communication took place December 12, 2006, and Fitzgerald claimed no knowledge about the mattresses Broco was soliciting for sale.  Within one day of Cagle's inquiry with Fitzgerald, Tempur-Pedic's representative attempted to respond to Broco's initial offer of 3,300 mattresses, without disclosing he had warned Tempur-Pedic of Broco's activities. Volovic warned the representative that Tempur-Pedic was inquiring about the mattresses, and because of such, Broco could not sell them at that time.

Nearly two months after Broco informed the Tempur-Pedic representative he could not sell the mattresses due to Tempur-Pedic's inquiries, Volovic again called to offer the representative over 3,000 new Tempur-Pedic mattresses for sale.  At such time, Volovic negotiated a purchase price of $975,000 for 3,000 mattresses.  Tempur-Pedic submits the retail value of such a quantity, depending on the type of mattresses, would be between 5 and 7 million dollars.  Tempur-Pedic acknowledged Volovic's most recent offer was 300 fewer mattresses than originally offered, indicating those mattresses had been distributed elsewhere or were sold.

Upon negotiation of the sale of the 3,000 mattresses, Volovic required Tempur-

Pedic's representative to execute an agreement not to re-sell the mattresses in the continental United States. Volovic also required the representative to sign a non-disclosure agreement prohibiting him from discussing the sale. Moreover, and what Tempur-Pedic finds disconcerting, Volovic represented to the representative that he was instructed by Tempur-Pedic directly to remove all Tempur-Pedic tags from the purchased mattresses and not to advertise the Tempur-Pedic product as manufactured by Tempur-Pedic, or as new. Tempur-Pedic asserts that this is false and denies any dealings with Volovic or Broco in any manner. Tempur-Pedic states that it has never authorized Volovic or Broco to deal in any of its products or to impose any conditions as suggested by Volovic.

Throughout the representative's negotiations with Volovic, he was supported by a private consultant ("Consultant") hired by Tempur-Pedic to assume the role of the representative's business partner. Throughout the negotiations, Volovic refused to identify the location of the mattresses until he received a down payment. After Tempur-Pedic negotiated the cost of the down payment from Volovic's initial demand of $100,000 to $10,000, such was wired to Broco's bank account on February 2, 2007. After receipt of the down payment, Volovic revealed the location of mattresses as being stored at an abandoned warehouse located at 560 West 2nd Street, Booneville, Arkansas. Tempur-Pedic submits it has performed a title search on the warehouse and discovered the warehouse is owned by "S. Ast" and "E. Mercado," P.O. Box 131, Fouke, AR 71837. Volovic also scheduled a meeting in Booneville with Consultant for February 5, 2007. The Consultant met with Volovic, and three other men who accompanied Volovic that were introduced as "Howard", "Tommy" and "Nelson." The Consultant subsequently learned the full names of these men to be the Separate Defendants Howard Hirsch, Tommy Scarcello and Nelson

Silva. While in the warehouse, the Consultant proceeded to inspect and hand count the mattresses that were stacked on hundreds of pallets and wrapped in the identical manner as those supplied to WtC. The Consultant counted only 2,650 mattresses, rather than 3,000 as Volovic represented for sale. The Consultant asked about the remaining 350 mattresses, and it was revealed by Silva to the Consultant that they were in a warehouse in Fort Smith, Arkansas. *See* Docket No. 07-2015, Affidavit of Johnny E. Cagle in Support of Motion for Temporary Restraining Order.

As the Consultant and the other four individuals continued their discussions, the Federal Bureau of Investigation entered the warehouse and conducted separate interviews of Volovic, Hirsch, Scarcello and Silva. Tempur-Pedic asserts that upon its information and belief, the 2,650 mattresses remain in the warehouse in Booneville and will remain there until Wednesday, February 14, 2007. Consultant was informed that by such date, if he did not purchase the mattresses, they will be sold to another party. Tempur-Pedic expresses its great concern that the mattresses remain vulnerable to further unauthorized distribution or destruction. For these reasons, Tempur-Pedic seeks an *ex parte* temporary restraining order to enjoin any further distribution or sale of its products.

Tempur-Pedic states that the nature of this matter raises the imminent and inherent risk that Defendants will redistribute the mattresses in an effort to conceal such and to further their fraudulent scheme of profiting at the expense of not only Tempur-Pedic, but those hurricane victims and others in need to whom the donated goods should have been directed. With this, Cagle's Affidavit reflects numerous communications with and, indeed notice to, Defendants and other participants of Tempur-Pedic's concerns, specifically the Defendants' actions being in contravention of the Charitable Donation Agreement. Tempur-

Pedic submits that such notice, coupled with the very real and imminent risk of further distribution to destinations unknown, and likely outside of the State of Arkansas, justifies the issuance of an *ex parte* temporary restraining order. *See Northwest Airlines, Inc. v. Bauer, --- F.Supp.2d --- 2006 WL 3733295 (D.N.D., December 15, 2006)* (*ex parte* temporary restraining order granted even when the identification and location of the defendant were known).

Contacts with the Defendants by Cagle and Consultant were similar to those of *Northwest Airlines*, wherein a Northwest Airline intern (under authority and supervision of Northwest) posed as a member of a large group seeking to acquire multiple "eCertificates" (vouchers) and contacted the defendant via his website. The intern then purchased seven eCertificates from the defendant via the website and Northwest subsequently moved for an *ex parte* temporary restraining order. Tempur-Pedic argues that such contact closely resembles that of Consultant, wherein he negotiated the purchase of 3,000 mattresses with Broco and Volovic and, in turn, met with Volovic to consummate the purchase. Notwithstanding the foregoing communications, the Court finds the nature of these transactions is quite unusual, and an ever-present threat of removal of the products exists. Tempur-Pedic asserts if further notice is given to Defendants of this proceeding, it would jeopardize the preservation of its products. From these facts, and the reasons established below, the Court finds the *Ex Parte* Temporary Restraining Order should be granted.

## LEGAL DISCUSSION

### I.    Standard for Granting Ex Parte Temporary Restraining Order (TRO)

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure:

> A temporary restraining order may be granted
> without written or oral notice to the adverse party
> or that party's attorney only if (1) it clearly appears

> from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that parties can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give notice and the reasons supporting the claim that notice should not be required.

F.R.C.P. 65.  In determining whether to grant a temporary restraining order (TRO) (or Preliminary Injunction), the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C. L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*).  The 8th Circuit has summarized these factors as follows:

> 1.    The movant's probability of success on the merits;
>
> 2.    The threat of irreparable harm to the movant absent the injunction;
>
> 3.    The balance between the irreparable harm and the injury that the injunction's issuance would inflict on other interested parties; and
>
> 4.    The public interest.

A district court has broad discretion when ruling on TROs and preliminary injunction requests.  *Manion v. Nagin*, 255 F.3d 535 (Minn. 2001).  The issuance of a preliminary injunction will be reversed only if the issuance "is the product of an abuse of discretion…." *Northwest Airlines, Inc. v. Bauer*, --- F.Supp.2d –- 2006 WL 3733295 (D.N.D., December 15, 2006), *citing City of Timberlake v. Cheyenne River Souix Tribe*, 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied*, 512 U.S. 1236, 114 S.Ct. 27401, 129 L.Ed.2d 861 (1994).  No single factor is dispositive.  All factors must be considered to determine whether on balance they weigh toward granting the injunction.  *Northwest Airlines*, 2006 WL 3733295 at *5 (*citation omitted*).  The burden of establishing the necessity of a temporary restraining order is on the

movant.  *Baker Electric Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

## II.    Probability of Success on the Merits

Tempur-Pedic contends that it is likely to succeed on its claims for replevin, breach of contract and fraud.  Tempur-Pedic submits that the "success on the merits" factor does not require the movant to demonstrate a greater than fifty percent chance that it will prevail on the merits. *Dataphase*, *supra*, 640 F.2d at 113.   Nor is the court "deciding whether the movant for a preliminary injunction will ultimately win." *Interbake Foods, L.L.C. v. Tomasiello* 461 F.Supp.2d 943, 960 (N.D.IA 2006).  Rather, the "question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, *supra*, 640 F.2d at 113.

Tempur-Pedic asserts the Court's intervention is necessary to preserve the status quo because of the apparent and imminent danger that the donated goods will be moved and further concealed, perhaps to a location outside of the United States.

## The Replevin Claim

Under Arkansas law, an Arkansas Circuit Court, and this Court, sitting in Diversity, may issue a writ of replevin on behalf of a party having the immediate right of possession in property.   *See* Ark. Code. Ann. 18-60-801, *et seq*.; *see also Garoogian v. Medlock*, 592 F.2d 997 (8th Cir. 1979) (upholding award of possession issued from the United States District for the Western District of Arkansas).  In *Medlock*, this Court issued a writ of replevin and ordered the United States Marshals Service to seize and hold a truck tractor after the Plaintiff submitted proof of ownership.  In that case, because the tractor could not be found, the defendant was arrested and held until the defendant produced the property.  *Id*. at 999.

Here, Tempur-Pedic presents its contract with WtC and its affidavit showing what it contends is overwhelming evidence that the donated goods have been sold for a profit by WtC and are presently in the possession of third parties without the right to possess them.

Tempur-Pedic has presented credible evidence that it has an immediate right to possess the mattresses and other donated property. Under the terms of Tempur-Pedic's contract with WtC, once WtC began selling the donated property for a profit, the donated property reverted back to Tempur-Pedic's ownership and control to dispose of in accordance with its original charitable purpose. Tempur-Pedic argues that by selling the property for profit, WtC misappropriated the goods. Tempur-Pedic argues that a seller can convey no greater title than that which he possesses. *See Eureka Springs Sales Co. v. Ward,* 226 Ark. 424, 427, 290 S.W.2d 434, 436 (1956) ("The general rule-as regards all personal property except money and negotiable paper-is, that a purchaser from a thief acquires no title against the true owner, in the absence of limitations and estoppel."). Thus, Tempur-Pedic contends that any of the Defendants who have purchased the misappropriated property are simply in possession of misappropriated goods and have no rights of possession. Tempur-Pedic insists, as the rightful owner of the property, it has the right to immediate possession.

The Arkansas Replevin statute provides a "short form" Replevin procedure in which the clerk of the Court may issue notice to the Defendants that replevin is sought and gives the Defendants five days to respond in writing to the Notice. If the Defendants do not respond within five days, the clerk will issue a writ of replevin. If the Defendants do respond, then the Clerk will ask the Court to set the matter for a hearing. *See* Ark. Code. Ann. § 18-60-808. Tempur-Pedic states that it intends to proceed under this short form Replevin

statute and will ask the Clerk of the Court to issue the required notices.

The Arkansas Replevin statute allows for immediate action to be taken in cases where the property is in danger of being concealed, destroyed, or removed from the jurisdiction. Ark. Code. Ann. §18-60-807 provides as follows:

> If the petitioner for an order of delivery, after otherwise complying with the requirements for issuance thereof, shall present evidence to the court that there is genuine danger that the property sought under the order will be removed from the court's jurisdiction, damaged, concealed, or otherwise jeopardized, the court shall have the power to direct the immediate appearance of the party having possession thereof or, if the party cannot be immediately served but the property can be located, to direct that the property be taken and impounded pending further hearing, in which event it shall be deemed in *custodia legis*, subject to possession by neither party without further order of the court

A.C.A. § 18-60-807 (Repl. 2003).

As reflected in Cagle's Affidavit, Tempur-Pedic contends there is a serious danger that the Donated Property will be concealed, sold, moved to another location, or even shipped abroad. Although Tempur-Pedic seeks a TRO under FCRP Rule 65 rather than seeking seizure of the property pursuant to Section 807, the provisions of 807 illustrate that a TRO is appropriate. Tempur-Pedic seeks an *ex-parte* TRO without notice in order to freeze movement of the mattresses and other donated property. Once the TRO is issued, then Tempur-Pedic may avail itself of the remedies present in the Arkansas Replevin statute. However, without the TRO, Tempur-Pedic contends that there may not be any Donated Property to Replevin.

Such an approach is a highly effective remedy for Tempur-Pedic, but at the same time, it is very fair to the Defendants. On an *ex-parte* basis, all that Tempur-Pedic seeks is an order stopping the movement, concealment, damage, or destruction of the Donated

Property.  Once the TRO is in place, Tempur-Pedic states that it will employ the Replevin statute to obtain its property. With its five day Notice provision in Section 808, the Replevin statute compliments Federal Rule 65 and its requirement that a hearing on a preliminary injunction be granted within 10 days of issuance of the TRO.   *See* F.R.C. P. 65 (b).  Thus, this Court may grant an *ex-parte* TRO while still allowing the Defendants the notice and hearing contemplated by the Replevin statute.  Tempur-Pedic submits it is fully prepared to prosecute this Replevin action and, stands ready, willing, and able to post sufficient security in an amount to be determined by the Court.

**The Fraud Claim**

The elements of fraud are (1) a false representation of material fact, (2) scienter, knowledge of the falsity of the assertion, or a high degree of disregard for whether the assertion was correct, (3) intent to induce the Plaintiff to act or refrain acting, (4) justifiable reliance on the representation, and (5) damages to the Plaintiff.  *See* Richard A. Lord, 26 *Williston on Contracts* § 69:3 (4th ed. 2006).  As reflected in the Cagle Affidavit, Tempur-Pedic argues that these elements are present here.

Tempur-Pedic contends that Separate Defendant, WtC, represented that it would distribute the Donated Goods to victims of Hurricane Katrina and other needy individuals and would not sell them for a profit. As described in the Cagle Affidavit, Tempur-Pedic contends that this proved to be false.  Tempur-Pedic states that it justifiably relied on the representation and shipped the donated goods to WtC on the condition, and with the understanding that the donated goods not be resold, distributed for sale, or otherwise sold for profit.  Tempur-Pedic contends that, although WtC agreed to these terms, WtC's subsequent actions indicate that WtC intended at the time of the agreement to sell and/or

distribute for sale, donated goods in violation of the Donation Agreement.  After delivering a substantial number of mattresses to WtC, Tempur-Pedic learned many of these same mattresses were being offered for sale throughout the country (*i.e.*, Bowling Green, Kentucky, Nashville, Tennessee, Highland Ranch, Colorado and Mechanicsburg, Pennsylvania (Cagle Affidavit ¶¶ 12-24).  Upon inquiry by Tempur-Pedic, WtC denied that the donated goods were being sold (Cagle Affidavit ¶ 18).  Tempur-Pedic states that it has suffered and will continue to suffer damages as described in the Brief.

A TRO may be an appropriate remedy in a case of fraud.  The Court notes that injunctions have been issued throughout the country to protect plaintiffs in matters where fraud is involved.  *See Allstate Ins. Co. v. Davidson Medical Group*, No. Civ.A.01-5938, 2004 WL 2357797 *3 (E.D.Pa. October, 18, 2004) (granting injunction where a defendant acted fraudulently in appropriating plaintiff's property); *Universal Marine Ins. Co. Ltd. v. Beacon Ins. Co.*, 581 F.Supp. 1131, 1138 (W.D.N.C., 1984) (finding overriding public interest in the prevention of fraud); *Marsellis-Warner Corp. v. Rabens*, 51 F.Supp.2d 508 (D.N.J., 1999) (granting preliminary injunction based on state law claims of fraud).  The Court finds that the allegations made here, along with the supporting evidence presented to the Court, support granting a Temporary Restraining  Order.

### III.    Tempur-Pedic will Suffer Irreparable Harm if Injunctive Relief is not Granted

Tempur-Pedic asserts that it will suffer imminent and irreparable harm if the requested injunctive relief is not granted.  The Court finds that harm is irreparable if there is no adequate remedy at law.  *Interbake foods, L.L.C. v. Tomasiello*, 461 F.Supp.2d 943 (N.D. Iowa 2006).  Here, Tempur-Pedic contends that money damages, while sought, will not suffice.  Tempur-Pedic has presented credible evidence that it has lost and will continue to lose millions of dollars worth of mattresses that it had attempted to donate to victims of Katrina and others in need of relief.  Additionally, Tempur-Pedic has presented credible evidence that it has suffered, and will continue to suffer injury to its reputation as a quality manufacturer of high-end, premium mattresses and related items.

### Loss of the Donated Products

The Affidavit of Johnny E. Cagle states that Tempur-Pedic has already lost thousands of mattresses it attempted to donate.  Tempur-Pedic submits that this loss is continuing as unauthorized sales continue to take place.  Additionally, Tempur-Pedic asserts it risks losing thousands of other mattresses if Defendants are not enjoined from moving those being stored in Booneville and Fort Smith, Arkansas.  Of the approximately 7,800 mattresses donated, approximately 3,000 are thought to be in Arkansas, nearly 40% of those designated for hurricane relief

Tempur-Pedic argues that money damages are not adequate to compensate Tempur-Pedic for the loss of the Donated Products.  Tempur-Pedic contends that its object in donating the mattresses was not remuneration, but effectuating its charitable intent, which WtC and the other Defendants appear to have thwarted to a great extent.  Although Tempur-Pedic is also suing WtC for money damages, Tempur-Pedic states this is unlikely

to fully restore Tempur-Pedic's loss because WtC, as a 501 (c) (3) organization may lack

sufficient resources to satisfy a judgment of the amount and magnitude necessary to restore

the value of the mattresses to Tempur-Pedic. Second, if the mattresses are moved for

further sale, Tempur-Pedic states that a multiplicity of suits would be generated as Tempur-

Pedic would potentially have to pursue separate actions against a great number of

individuals and entities engaging in unauthorized sales of Tempur-Pedic products.

## Harm to Reputation and Goodwill

Because of the sales of the Donated Goods, Tempur-Pedic states that its products

are being sold at below-market rates by unauthorized retailers.   Tempur-Pedic submits this

hurts its reputation in two ways.  First, these below market sales cheapen the marketing and

brand image that Tempur-Pedic has spent years of effort and millions of dollars to cultivate.

Second, the likely mishandling of the Donated Goods by untrained, unauthorized retailers

is likely to physically damage the mattresses and shorten their life, thereby damaging

Tempur-Pedic's reputation with the public as a manufacturer of quality merchandise.

Tempur-Pedic contends that all of these harms are diffuse and difficult, if not

impossible, to calculate.  Although the damage to Tempur-Pedic's reputation and good will

is intangible, such injuries may constitute irreparable harm.  *Pro Edge, L.P. v. Gue, 374*

*F.Supp.2d 711, 751 (N.D. Iowa 2005).*

## IV.    The Balance of Harm and the Public Interest

## Balance of Harms

Tempur-Pedic asserts that the balance of harm weighs in Tempur-Pedic's favor

because if the TRO is granted, Tempur-Pedic will be assured of the preservation of its

products and have the ability to prohibit any further distribution to locations, possibly abroad,

unknown to Tempur-Pedic.  Further, Tempur-Pedic argues that a temporary restraining order would prohibit any and all unauthorized sales of Tempur-Pedic's products at a rate far below the products' true value.  Although the Defendants lack the requisite authority to market, distribute and sell Tempur-Pedic products, Defendants have and continue to place these products in a market that competes directly with Tempur-Pedic's authorized retailers. Without an injunction, such would continue.

Furthermore, Tempur-Pedic argues that if the Court were to issue an injunction, Defendants would suffer no harm whatsoever.  Referring to its allegations of fraud and misappropriation of their donated products, Tempur-Pedic argues that Defendants are not entitled to continue a fraudulent scheme.  *See Allstate Ins. Co. Ltd. v. Davidson Medical Group*, 2004 WL2357797 (ED Pa. 2004)(granting injunction where defendant acted fraudulently in appropriating plaintiff's property, and prevention of unjust enrichment by means of fraud and misrepresentation, even if affecting only private entities, is in the public interest).  Tempur-Pedic's position is that Defendants will not experience harm if they are enjoined from the unauthorized distribution and sale of the misappropriated goods. *See and compare Northwest Airlines, Inc*, 2006 WL 3733295 at *5 (finding balance of harm weighed in petitioner's favor because protecting its valuable intellectual property outweighed any financial loss that the defendant would incur by complying with applicable trademark law).

The "balance of harms" analysis must also examine the impact a preliminary injunction may have upon those not a party to the lawsuit, such as the public at large.  *Pro Edge, L.P.,* 374 F.Supp at 751.  To not enjoin Defendants would be to circumvent the intent of the Charitable Donation Agreement, and would further allow the misappropriation of

goods from those victims who have desperately awaited any and all support and relief made available to them.  It is imperative these goods be re-directed to those in need.  Tempur-Pedic contends that the interests of thousands who continue to rebuild from such devastation outweigh the Defendants' interest in selling goods that were released by Tempur-Pedic for charitable purposes.  The Court finds the impact on the public at large is greater than that on Defendants.

## Public Interest

Pursuant to *Dataphase*, the public's interest must also be taken into consideration outside of the "balance of harms" analysis when determining whether a temporary restraining order or a preliminary injunction should be issued.  *Dataphase Systems, Inc.*, 640 F.2d at 114.  Tempur-Pedic avers an injunction in the present case would clearly be in the public's best interest.  Tempur-Pedic contends that the mattresses were shipped to WtC for the sole purpose of delivery to victims of Hurricane Katrina and others in need.  As residents of the Gulf region desperately awaited any and all support made available to them, Defendants diverted the donations for their own interests. *See Universal Marine Ins. Co. Ltd. v. Beacon Ins. Co.*, 581 F.Supp. 1131, 1138 (D.N.C. 1984) (finding overriding public interest in the prevention of fraud and the public interest against encouraging or tolerating fraud can be protected only if an injunction is issued).   Charitable contributions serve the public interest in many obvious ways.  However, the Court understands that schemes employed to take advantage of such charity controverts the interests the public seeks to satisfy.  Tempur-Pedic argues that the only way the public's interest can be protected is by granting an injunction.  Tempur-Pedic suggests that to do so will preserve the interest the public has in discouraging fraudulent activities.

The Court finds that without an injunction, there is a significant danger the donated items intended for Katrina relief and other charitable recipients will not be recovered and directed to the charitable purpose for which they were donated.   Therefore, the public interest weighs in favor of granting Tempur-Pedic's *ex parte* temporary restraining order.

## CONCLUSION

After carefully reviewing the entire record, the Court finds that Tempur-Pedic has met its burden of establishing the necessity of a Temporary Restraining Order.  The Court grants the Plaintiff's Motion for *Ex Parte* Temporary Restraining Order and will reserve ruling on the request for a preliminary injunction until after the show cause hearing.

**IT IS ORDERED** that Waste to Charity, Inc., Broco Supply, Inc., Jack Fitzgerald, Eric Volovic, Howard Hirsch, Thomas Scarcello and Nelson Silva, their officers, affiliate companies, agents, servants, employees, successors, licensees and assigns, and all others acting in concert and in privity with them are temporarily:

enjoined from and restrained from directly or indirectly moving, transporting, shipping, selling, offering for sale, concealing, damaging, destroying, or otherwise interfering with any Tempur-pedic mattresses, pillows, slippers, or other merchandise that is in the possession, custody or control of each and every defendant, including each of their officers, affiliate companies, agents, servants, employees, successors, licensees, and assigns having been previously donated by Tempur-Pedic to Separate Defendant Waste to Charity , Inc. (the "Donated Property"); and shall

(B)     Identify in writing, to Counsel for the Plaintiff, within five days of

service of this Order, the location of each item that constitutes Donated Property.

**IT IS ORDERED** that the Defendants shall appear in the United States District Court for the Western District of Arkansas in Fort Smith on the 26th day of February, 2007, at 2:00 P.M., to show cause under Rule 65 of the Federal Rules of Civil Procedure why Defendants, their agents, successors, assigns, principals, employees, attorneys, representatives, licensees and affiliate companies should not be preliminarily enjoined during the pendency of this action from engaging in the above-described acts.

**IT IS FURTHER ORDERED** that Defendants shall preserve all materials, including those in electronic format, which are relevant to this matter pursuant to Rule 26 of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the requirement for security under Rule 65(c) is set at $200.000.

ISSUED THIS 16th  DAY OF FEBRUARY 2007 AT 2:12 P.M. O'CLOCK.

/s/ J. Marschewski_____
Honorable James R. Marschewski
United States Magistrate Judge