```
`                    IN THE UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF ARKANSAS
                             FORT SMITH DIVISION
```

TEMPUR-PEDIC
INTERNATIONAL, INC.                                                     PLAINTIFF

      v.                                  Civil No. 07-2015

WASTE TO CHARITY, INC.;
BROCO SUPPLY, INC.; JACK
FITZGERALD; ERIC VOLOVIC;
HOWARD HIRSCH; THOMAS
SCARELLO; NELSON SILVA;
CLOSE OUT SURPLUS AND
SAVINGS, INC., and ERNEST PEIA                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This replevin, breach of contract, and fraud action was filed by Tempur-Pedic International, Inc. on February 13, 2007. The court has jurisdiction by virtue of the existence of diversity jurisdiction.

On February 14, 2007, Tempur-Pedic filed a motion for temporary restraining order (TRO) or preliminary injunctive relief (Doc. 2). A TRO was put in place until the parties could be heard on the motion.

On March 5, 2006, a hearing was held on the motion. At the hearing, the court heard the testimony of the following witnesses: (1) Johnny Cagle; (2) Keith Moore; (3) James White; (4) Stanley Campbell; (5) Ronad Crenshaw; and (6) Ernest Peia. The motion for TRO is now before the undersigned for issuance of this report and recommendation.

## BACKGROUND

Tempur-Pedic (TP) manufactures, markets, and distributes mattresses, pillows, cushions, slippers and other similar products through a network of authorized and approved retail distributors. *Affidavit of Johnny Cagle* at ¶ 2. Each mattress model references the TEMPUR-PEDIC ® mark in its name. *Id.*

Mattresses sold in the ordinary course of business by authorized TP distributors are enclosed in a hypo-allergenic cover, sealed in a plastic bag, and packed in cardboard boxes labeled with the TP's registered trademarks. *Cagle Affidavit* at ¶ 6. Goods designated for charitable donations are packaged differently. *Id.* at ¶ 8. The mattresses do not include the hypo-allergenic cover and are not boxed in the cardboard boxes. *Id.* Instead, the mattresses are wrapped in clear plastic, stacked on wooden pallets, and then the entire load is wrapped in another layer of heavy-duty plastic. *Id.*

New TP slippers and pillows are packed in display cartons and then in cardboard boxes marked with TP's registered trademarks. *Cagle Affidavit* at ¶ 6. Donated pillows are removed from their retail packaging and placed in large pallet size cartons and encased in plastic wrap prior to shipment. *Id.* at 8. Donated slippers or foot comforters remain in their original packaging and cardboard boxes and are palletized and wrapped in plastic wrap before shipping. *Id.* The donated slippers at issue in this case were discontinued items that would only have been available as charitable products. *Id.*

In 2005, TP decided to make a donation of approximately $15 million in mattress, slipper, and pillow inventory to Gulf Coast residents victimized by Hurricane Katrina. *Cagle Affidavit* at ¶ 7. This case concerns a donation by TP of approximately 7800 of its mattresses to

Waste to Charity (WCT). WCT was to distribute these products to Hurricane Katrina victims.

TP alleges that instead of distributing the mattresses, pillows, and slippers (hereinafter donated products) as promised WCT sold the donated products for profit. TP seeks a TRO to stop further movement of the donated products in the stream of commerce, to recover the donated products and to return them to their charitable purpose.

The facts more specifically are as follows. On November 14, 2005, as part of its corporate relief efforts, TP entered into a charitable donation agreement with Jack Fitzgerald and his company, WCT, to distribute mattresses, slippers, and pillows. *Cagle Affidavit* at ¶ 9.

As a recipient of charitable product donations WCT agreed to the following restrictions:

1. All products donated by Tempur-Pedic are not to be resold, distributed for sale, or otherwise sold for profit in any venue.

2. All products donated by Tempur-Pedic are not covered by any warranties.

3. All products donated by Tempur-Pedic are to be clearly identified as products manufactured by Tempur-Pedic in any promotional materials associated with the donation.

4. All products donated by Tempur-Pedic are not to be used or portrayed in a disparaging way or otherwise portrayed in a negative light.

5. Should you wish to dispose of the Tempur-Pedic Products or any of them, you will notify us and give us an opportunity to retrieve them or designate their disposition, and you will comply with any reasonable request from us for their disposition.

*Exhibit* 1 to the *Cagle Affidavit*. (Plaintiff's Exhibit 1)

TP made approximately fifty deliveries of donated goods to WTC. *Cagle Affidavit* at ¶ 11 & *Exhibit* 2 to the *Cagle Affidavit*. (Plaintiff's Exhibit 12) After these deliveries were made, TP maintains it learned that the donated products were not being provided to Hurricane Katrina

-3-

victims but were instead being sold for profit in violation of the terms of the charitable donation agreement.

Specifically, after the donations were made, TP maintains it observed unauthorized individuals or entities offering TP mattresses, pillows, and to a lesser degree slippers, for sale. *Cagle Affidavit* at 12.

In October of 2006, Cagle was informed by an authorized dealer (Informant One) that TP mattresses were being sold from a truck parked in the Green Hills area of Nashville, Tennessee. *Id.* At about the same time, a customer service employee of TP received a complaint that a man named Robert or Bobby Anastario, representing US Warehousing in Bowling Green, Kentucky, was trying to sell one or more truckloads of TP mattresses for $30,000 and that additional TP mattresses were being sold in Nashville, Tennessee. A public records check indicated that the Bowling Green Warehouse was operated by US Warehousing and managed by Robert Anastario.

Cagle traveled to the Bowling Green Warehouse on October 9, 2006. *Cagle Affidavit* at ¶ 14. He met with Anastario and asked about the sale of TP mattresses. *Id.* Anastario showed him the inside of a trailer containing TP mattresses on pallets with full pallets wrapped in plastic and partial pallets unwrapped. *Id.* Cagle observed five pallets of TP mattresses each stacked in identical fashion as those entrusted to WTC for distribution to charity. *Id.* The warehouse was operated as a commercial facility and was not associated with a charitable organization. *Id.* Anastario advised Cagle he had sold some of the TP mattresses in Bowling Green, had sold some to Al Tribble in Nashville, and had some TP slippers in a warehouse that were also being sold. *Id.* Anastario indicated he had purchased the slippers on eBay. *Id.* at ¶ 18.

Cagle then observed four pallets loaded with cardboard boxes contains pairs of TP slippers. *Cagle Affidavit* at ¶ 15. Cagle obtained permission to remove a label from one of the pallets. *Id.* The label was identified as coming from slippers donated to WTC and shipped from the TP warehouse in Henderson, Kentucky. *Id.*

On October 17, 2006, Cagle contacted Fitzgerald. *Cagle Affidavit* at ¶ 16. Fitzgerald indicated he used the Bowling Green Warehouse for storage of donated slippers but did not know that they were being sold for profit. *Id.* Fitzgerald also stated he did not know anything about the facility being used for storage of TP mattresses. *Id.* Fitzgerald indicated he would arrange to have the slippers moved out of the Bowling Green Warehouse and later provided proof of delivery of the movement. *Id.* at ¶ 17.

In early October of 2006, Cagle learned from a second informant (Informant Two) that a male who identified himself as Eric Volovic from Broco Supply, Inc., a building material wholesaler/importer, operating in Mechanicsburg, Pennsylvania, offered to sell 3,300 mattresses for $295 per mattress. *Cagle Affidavit* at ¶ 21. According to Cagle, TP mattresses, depending on size and style, retail for between $699 and $6,399 per mattress. *Id.*

Volovic provided Informant Two with a photograph of the mattresses. *Cagle Affidavit* at ¶ 23. Cagle was able to determine the mattresses were part of those provided to WTC for distribution to charity. *Id.*

On October 17, 2006, Cagle contacted Fitzgerald about the mattresses being offered for sale by Broco. *Cagle Affidavit* at ¶ 24. Within a day, when Informant Two responded to Broco's original offer, the informant was told that someone within TP was inquiring about the mattresses and Volovic could not sell them at that time. *Id.*

In November, Cagle learned that seventy TP mattresses were given to a QuickDrop store in Highland Ranch, Colorado, for sale on eBay. *Cagle Affidavit* at ¶ 19-20. Cagle was able to determine from the shipping records that the mattresses being offered for sale were from the supply provided to WTC pursuant to the charitable donation agreement. *Id.* at ¶ 20.

At the hearing Cagle did testify that the number on the label (Plaintiff's Exhibit 3) did correspond with shipping number 11201853. This shipping number is assigned to a shipment of 70 mattresses of various sizes given to WTC on July 28, 2006 and represented to have been given to Hope Ministries. (Plaintiff's Exhibit 6, page 5)

Based on the events in Bowling Green, the incident involving QuickDrop, and the offer from Broco, Cagle advised TP employees to cease donating TP products to WTC until further notice. *Cagle Affidavit* at ¶ 25. Cagle also asked Fitzgerald for a schedule showing where the TP products had been placed for distribution to individuals or receiving charities. *Id.* In response, Fitzgerald claimed he had distributed all TP property to three charitable organizations, Operation Compassion, Rhema International and Hope Ministries. *Cagle Affidavit at* ¶ 25 & Exhibit 10.

Approximately eight weeks after Volovic of Broco had made the initial offer to sell 3,300 new TP mattresses to Informant Two, Volovic offered to sell 3,000 new TP mattresses. *Cagle Affidavit* at ¶ 26. Volovic conditioned the offer on the following: (1) an agreement not to sell any of the purchased products in the continental United States (Plaintiff's Exhibit 9); and (2) the signing of a non-disclosure agreement requiring that Informant Two not discuss the sales transaction. (Plaintiff's Exhibit 8) Volovic also told Informant Two that he had received instructions from TP that all tags must be removed from the mattresses and they were not to list

TP as the manufacturer or identify the mattresses as new. *Id.* at ¶¶ 27-28 & Exhibits 11, 12 & 13.

TP hired a Consultant (Keith Moore) who assisted Informant Two with his negotiations with Volovic and posed as an employee of Informant Two. *Cagle Affidavit* at ¶¶ 29-30. Volovic refused to reveal where the mattresses were located until he received a down payment. *Id.* at ¶ 31. Volovic initially demanded a down payment of $100,000 but this was eventually reduced to $10,000. *Id.*

After the down payment was made by wire transfer, Volovic revealed the mattresses were stored in a warehouse facility located at 560 West 2nd Street, Booneville, Arkansas. *Cagle Affidavit* at ¶ 32. After the storage location was identified, Cagle contacted law enforcement authorities. *Id.* at ¶ 33.

On February 5, 2007, the Consultant went to Booneville and at 1:00 p.m. Volovic arrived at the Booneville Warehouse. *Cagle Affidavit* at ¶ 34. Volovic was accompanied by Howard Hirsch, Nelson Silva, and Thomas Scarcello. *Id.* at ¶ 35.

The Consultant inspected hundreds of pallets containing what appeared to be TP mattresses with hypo-allergenic covers removed that were palletized and wrapped in the same manner as those supplied to WTC. *Cagle Affidavit* at ¶ 38. The mattress inventory included 2,650 mattresses. Upon inquiry, the Consultant was told the missing 350 mattresses were being stored in a warehouse in Fort Smith, Arkansas. *Id.* at ¶ 39.

While the Consultant was inside the warehouse, Volovic, Hirsch, Scarcello, and Silva were separated and interviewed by the Federal Bureau of Investigation (FBI). *Cagle Affidavit* at ¶ 40. While the FBI was conducting their investigation at the warehouse, Hirsch repeatedly

assured the Consultant that the FBI would find that he had acquired the TP mattresses legitimately. *Id.* at ¶ 41.

On February 6, 2007, the Consultant spoke with Hirsch over the phone and was told that the Consultant would receive the mattresses. *Cagle Affidavit* at ¶ 43. Hirsch then allegedly admitted the mattresses were donated by TP to charity and then sold to an individual from whom Hirsch purchased them. *Id.* The Consultant asked Hirsch to supply a paper trail of sources of the mattresses so he could ascertain that Hirsch had good title to them and Hirsch promised to do so. *Id.*

On February 9, 2007, the Consultant again spoke with Hirsch. *Cagle Affidavit* at ¶ 44. At that time, Hirsch stated he would not provide a paper trail showing ownership of the mattresses. *Id.* However, he offered to have the purchase money put in escrow. *Id.* Hirsch also claimed that TP was involved in a lawsuit where there was a ruling in favor of the charity on the grounds that the company had given up rights to the property. *Id.* Hirsch then told the Consultant he only had until February 14th to make up his mind or the product would be sold to someone else. *Id.*

On February 20, 2007, TP was contacted by Ernest Peia regarding the goods in the Booneville warehouse. Peia stated he was the owner of CSS, Inc. and was in the business of buying goods in bulk for future distribution and sale. *Amended Complaint* at ¶ 54. Peia advised TP that CSS had on October 12, 2006, purchased 4,000 TP mattresses for a purchase price of $500,000 from Action Distributors, Inc. (ADI), operated by Thomas Scarcello. *Id.* at ¶ 55; *Brief in Response to the Motion for TRO* (Doc. 16) at page 2. It is also alleged that Silva is an employee of CSS. *Amended Complaint* at ¶ 56.

CSS maintains that the mattresses it purchased were used TP mattresses. *Brief in Response to the Motion for TRO* (Doc. 16) at page 2. CSS indicates ADI told it the mattresses had been returned to TP pursuant to its full refund within thirty day policy. *Id.* Because the mattresses could not be sold by TP again as new, ADI purchased the mattresses. *Id.* CSS indicates it has been doing business with ADI for several years. *Id.*

## DISCUSSION

Rule 65 of the Federal Rules of Civil Procedures governs the issuance of temporary restraining orders and preliminary injunctions. In deciding a motion for a temporary restraining order or a preliminary injunction, the courts are instructed to consider what have come to be known as the *Dataphase* factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). *See also Minnesota Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1307 (8th Cir.1997); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir.1993). No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction. *See Sanborn*, 997 F.2d at 486; *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.*, 815 F.2d 500, 503 (8th Cir.1987).

AO72A
(Rev. 8/82)

With the applicable standard in mind, we turn to an examination of the first factor whether plaintiff has established a likelihood of success on the merits.[1] TP "is not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). Rather, it is a question of whether TP has a "fair chance of prevailing" after discovery and a full trial. *Id. citing Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.").

The crux of the parties' arguments can be simply summarized. TP maintains WTC misappropriated the donated property and that a purchaser from a thief acquires no title against the true owner. *See e.g., Eureka Springs Sales Co. v. Ward*, 226 Ark. 424, 427, 290 S.W.2d 434 (1956). It therefore contends CSS acquired no title to the mattresses. Alternatively, if the court determines WTC did obtain "voidable title" title to the donated property, TP argues CSS is not a good-faith purchaser for value based on the circumstances surrounding the alleged sale.

In contrast, CSS, Peia, and Silva (collectively referred to as CSS) maintain the provisions of the Uniform Commercial Code apply to the transaction and WTC held "voidable title" and could therefore pass good title to good-faith purchasers for value without knowledge of WTC's alleged fraudulent conduct. Ark. Code Ann. § 4-2-403(1); *Midway Auto Sales, Inc. v. Clarkson*, 71 Ark. App. 316, 29 S.W.3d 788 (2000). CSS maintains that having purchased its mattresses

---

[1] "A district court sitting in diversity jurisdiction applies the conflict of law rules for the state in which it sits." *DCS Sanitation Managment, Inc. v. Casillo*, 435 F.3d 892 (8th Cir. 2006). The parties have assumed that Arkansas law applies. As the court believes the provisions of the Uniform Commercial Code (UCC) are applicable, and Arkansas has adopted the UCC the court need not for purposes of this motion decide the choice of law question.

from ADI it is such a good-faith purchaser for value without knowledge of WTC's fraudulent conduct. CSS contends TP cannot, therefore, show a likelihood of success on the merits and the motion for preliminary injunction must be denied.

The Uniform Commercial Code applies to all "transactions in goods." Ark. Code Ann. § 4-2-102. A purchase is defined to include "taking by sale . . . gift, or any other voluntary transaction creating an interest in property." Ark. Code Ann. § 4-1-201(32). *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197 (1st Cir. 2004)(applying Massachusetts law–UCC applies to replacement of thirty-three windows free of charge–however, gifts do not receive implied warranties).

Section 4-2-403 "recognizes a legal distinction between a sale of stolen goods and a sale of goods procured through fraud." *Midway Auto Sales, Inc. v. Clarkson*, 71 Ark. App. 316, 318, 29 S.W.3d 788 (2000). As noted by the court in *Midway Auto Sales*, "[a]bsent exigent circumstances, one who purchases from a thief acquires no title as against the true owner. However, under section 4-2-403, the result is different when property obtained by fraud is conveyed to a bona fide purchaser." *Id.* (citation omitted).

Section 4-2-403 in applicable part provides as follows:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser; or
(b) the delivery was in exchange for a check which is later dishonored; or
(c) it was agreed that the transaction was to be a "cash sale"; or

-11-

>     (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Ark. Code Ann. § 4-2-403.

The good-faith purchaser exception is designed to "promote finality in commercial transactions and thus encourage purchases and to foster commerce. It does so by protecting the title of a purchaser who acquires property for valuable consideration and who, at the time of the purchase, is without notice that the seller lacks valid and transferable title to the property." *United States v. Lavin*, 942 F.2d 177, 186 (3d Cir. 1991)(citation omitted).

The court in *Midway Auto Sales* went on to review the distinction between "void" and "voidable title." It quoted the following discussion from a well known treatise on UCC:

>     Under 2-403, voidable title should be distinguished from void title. A thief, for example, "gets" only void title and without more cannot pass any title to a good faith purchaser. "Voidable title" is a murky concept. The Code does not define the phrase. The comments do not even discuss it. Subsections (1)(a)-(d) of 2-403 clarify the law as to particular transactions which were "troublesome under prior law." Beyond these, we must look to non-Code state law. In general voidable title passes to those who lie in the middle of the spectrum that runs from best faith buyer at one end to robber at the other. These are buyers who commit fraud, or are otherwise guilty of naughty acts (bounced checks), but who conform to the appearance of a voluntary transaction; they would never pull a gun or crawl in through a second story window. Presumably these fraudulent buyers get voidable title from their targets, but second story men get only void title because the targets of fraud are themselves more culpable than the targets of burglary.
>
>     Subsection (1)(b) of 2-403 deals with a more common occurrence: the "rubber check." Even when Bert Buyer pays Sam Seller with a check that returns to Sam marked "NSF," a good faith purchaser from Bert takes good title.
>
>     Subsection (1)(d) of 2-403 provides that even where delivery was procured through criminal fraud, voidable title passes. Thus if Bert acquired goods from Sam with a forged check, a good faith purchaser from Bert would obtain good title.

*Midway Auto Sales*, 71 Ark. App. at 318-319 (*quoting* James J. White and Robert S. Summers, *Uniform Commercial Code* § 3-12 at 187-89 (4 ed.1995)).

Here, TP voluntarily gave the donated property to WTC. There was no showing that WTC was just a sham operation. From the evidence before the court, the court believes WTC lawfully came into possession of the property. Thus, it appears clear WTC did acquire voidable title to the donated property.

After the donations were made, TP has presented evidence establishing a fair probability that at least a portion of the donated products were sold at various places around the country rather than put to their intended charitable use. WTC, although it claimed no knowledge of the sales, had sufficient control of the property, at least with respect to the Bowling Green Warehouse, to represent that it had moved the slippers after Cagle discovered they were being sold from that facility.

With respect to the mattresses purchased by CSS from ADI, the issue therefore becomes whether CSS was a good-faith purchaser. "Good faith" is defined to mean "honesty in fact in the conduct or transaction concerned." Ark. Code Ann. § 4-1-201(19). The court has given careful consideration to the documentation submitted to the court in connection with the motion for TRO and/or preliminary injunction, the response filed by CSS, the testimony of the witnesses at the hearing, and the arguments of counsel. I conclude TP has shown a probability that it will succeed on the merits of establishing that CSS is not a good faith purchaser for value of the mattresses.

A number of factors lead the court to this conclusion. First, the price of the mattresses was substantially below market value. The average price per mattress paid by CSS was $125. (Defendant's Exhibit 1) Cagle testified that the value of these mattresses would be substantially above that figure and that some of these mattresses could go from $600 and up. Even Mr. Pia acknowledged that the range of TP mattresses, on the web page would go from $600 to $1,995. Second, the terms of the purported sale were suspicious: all tags had been removed; while the mattresses were confirmed to be TP mattresses they could not be sold as such; no sales could be made to TP dealers; and the representation was made that TP has confirmed the mattresses would not have tags on them. Third, both the timing of the attempted sales and the use of Broco Supply, a building material supplier, lends support to the conclusion that CSS was not a good faith purchaser for value. Fourth, Peia, the president of CSS, acknowledged that he knew TP did not authorize the sale of used mattresses. Fifth, the corporate charter of ADI had been revoked both before and during the relevant period of time. (Plaintiff's Exhibit 14) It should also be noted that Michael H. Lowe was listed as the Agent for the defunct ADI corporation in New Jersey. This is the same individual that was operating the fork lift at the Boonville warehouse according to the testimony of Chief of Police Stanley Campbell. Sixth, Peia had previously done a web search of Scarcello (ADI) and the search revealed very negative information. *See e.g., Gentry v. Alley*, 228 Ark. 236, 240, 306 S.W.2d 695 (1957)(non-UCC case; "[I]f he had notice of circumstances that ought to have put a prudent business man upon inquiry, and he failed to make inquiry, he was not an innocent purchaser.").

We turn to the question of whether TP has shown a threat or irreparable harm if the injunction does not issue. TP contends money damages are not adequate to compensate it for

AO72A
(Rev. 8/82)

the loss of the donated products. By definition it states its object in donating the products was not remuneration but effectuating its charitable intent. Moreover it states that its good will and reputation will be harmed by the sale of these goods at below-marked rates by unauthorized dealers.

The court agrees with TP that the loss to it by the failure to grant the injunction cannot be measured strictly in terms of monetary damages as suggested by CSS. *See e.g., Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987)(a party has not shown irreparable harm if its alleged injuries can be remedied in a suit for money damages). Nor do we believe the damages to TP are purely speculative. *See e.g., Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 602 F.2d 150, 154 (8th Cir. 1979)("[T]he speculative nature of the threatened harm support[s] the denial of injunctive relief."). *See also Blue Moon Entertainment, LLC v. City of Bates*, 441 F.3d 561, 564 (8th Cir. 2006)("[T]he failure of a movant to show irreparable harm is an independently sufficient basis upon which to deny a preliminary injunction."). TP expends substantial resources and efforts aimed at controlling the quality of its product and the distribution through a network of authorized dealers. A donation to charity designed to provide assistance to victims of Hurricane Katrina does not put in danger these efforts or impact TP's relationship with its authorized dealers. However, the sale of TP products under the circumstances existing here does put those relationships and efforts in jeopardy and also defeats TP's donative intent. Under the circumstances of this case, we believe TP has shown threat of irreparable harm.

Third, we must consider balance the harm to the non-moving party should the injunction issue. Here, the impact of granting the injunction will mean CSS is prohibited from selling or

otherwise disposing of the mattresses. CSS maintains it is a much smaller company than TP, has smaller resources, and has invested a significant amount of its financial resources in purchasing 4,000 used mattresses hoping to resell them for profit. The harm inflicted on TP by failing to issue the injunction would in the court's mind far exceed the harm to CSS. Any monetary harm potentially inflicted on CSS can also be alleviated by the requirement that TP be required to post adequate security for issuance of the injunction.

Finally, we turn to the question of whether the public interest favors the issuance of the injunction. While "the public interest is not ordinarily implicated by concerns related to business reputation," *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 789 (8th Cir. 2004)(recognizing public interest in avoiding the danger of consumer deception in a case involving use of Internet domain names likely to confuse and divert Internet users from their intended online destinations), we believe there are broader issues here including protecting a network of authorized dealers, TP's registered trademarks, avoiding consumer deception, protecting TP's donative intent, as well as ensuring that donated goods reach those they are intended for. There is a fair probability that the mattresses in question are those specifically designated for charitable donation to the victims of Hurricane Katrina. Under the circumstances of this case, we believe the public interest favors the granting of the motion for preliminary injunction.

## CONCLUSION

I therefore recommend that the motion for preliminary injunction be granted. I recommend that TP required to post-bond in the amount of $500,000.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of March 2007.

/s/ *J. Marschewski*
   HON. JAMES R. MARSCHEWSKI
   UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)