IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TEMPUR-PEDIC INTERNATIONAL, INC.                                        PLAINTIFF

v.                                  No. 07-2015

WASTE TO CHARITY, INC., et al.                                         DEFENDANTS

**CLOSE OUT SURPLUS AND SAVINGS, INC.'S OBJECTIONS TO THE
REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff failed to establish a basis for a preliminary injunction against Close Out Surplus and Savings, Inc. ("CSS"), and its employees Ernest Peia and Nelson Silva. CSS, as a downstream *bona fide* purchaser of CSS's mattresses, stands in a much different position than Waste to Charity, Inc. ("WtC"), the entity to which plaintiff allegedly donated mattresses. Plaintiff has no evidence whatever that CSS had knowledge of any alleged fraud by WtC. Indeed, CSS was the only defendant to appear in person at the hearing and present evidence regarding its *bona fide*-purchaser status. CSS and its employees should not be included in the preliminary injunction.

At the show-cause preliminary-injunction hearing, plaintiff failed in its burden of demonstrating a likelihood of prevailing on the merits of its claim that the used mattresses owned by CSS are some of the same mattresses plaintiff allegedly donated to WtC. But even assuming that the mattresses owned by CSS are some of the same mattresses plaintiff gave to WtC, plaintiff failed in its burden of demonstrating a likelihood of prevailing on the merits of its claim that CSS was not a good-faith purchaser for value without knowledge of any alleged fraud by WtC. Pursuant to 28 U.S.C. § 636(b)(1), the Court should reject the Magistrate Judge's Report and Recommendation that CSS be included in the preliminary injunction.

## I.  BACKGROUND

CSS is a liquidator, based in New Jersey, that sells large volumes of closeout merchandise, both nationally and internationally.  Transcript of March 5, 2007, Hearing ("Transcript") at 111.  CSS has been in business for twelve years.  *Id*.  CSS sells its merchandise to thousands of different companies, including at trade shows.  *Id*.  CSS had gross sales of approximately $15 million last year.  *Id*. at 128.

One wholesaler from which CSS has purchased merchandise in the past is Action Distributors, Inc. ("ADI").  *Id*. at 111.  CSS has been purchasing merchandise from ADI without any problems since CSS started its business twelve years ago.  *Id*. at 112.  CSS's contact person with ADI has been Tommy Scarcello.  *Id*.  Only approximately five percent of CSS's merchandise is obtained from ADI.  *Id*. at 122.  CSS has no other relationship with ADI.  *Id*.

CSS has been purchasing used mattresses from ADI for approximately five years, including plaintiff's Tempur-Pedic brand mattresses.  *Id*. at 112, 120.  CSS has, in the ordinary course of business, been reselling used Tempur-Pedic brand mattresses during this same time period.  *Id*. at 120.  CSS has never received any new Tempur-Pedic brand mattresses from ADI.  *Id*. at 156.  Plaintiff has known for approximately five years that CSS purchases and re-sells used Tempur-Pedic brand mattresses.  *Id*. at 162.  CSS has never received any objection from plaintiff regarding CSS's activities.  *Id*. at 120.

On October 12, 2006, CSS in the ordinary course of business purchased 4,000 used Tempur-Pedic mattresses from ADI.  *Id*. at 113-14; Purchase Order ("Purchase Order"), Defendants' Hearing Exhibit 1.  Specifically, CSS purchased 500 Classic Bed Cal King Size mattresses, 1,000 Classic Bed King Size mattresses, 1,300 Classic Bed Queen Size mattresses, 550 Classic Bed Full Size

mattresses, and 650 Classic Bed Twin Size mattresses.  *Id.*  ADI advised CSS that these mattresses were used foam mattresses, mattresses that had been returned to plaintiff pursuant to plaintiff's policy that a customer could return a purchased mattress for a full refund within thirty to one hundred twenty days of purchase, or pursuant to plaintiff's warranty.  Report & Recommendation (Doc. # 23) at 9.  Because the returned mattresses were used, plaintiff could no longer sell the mattresses as new, according to ADI.  *Id.*  Indeed, some of the mattresses that CSS purchased had stains or were otherwise in disrepair.  Transcript at 155-56.  CSS paid to ADI $500,000 for these used mattresses, *i.e.*, $125 per mattress.  *Id.* at 114-16, 153.  The price that CSS paid was in line with what another wholesaler, plaintiff's witness James White, paid for a substantially smaller number of mattresses; Mr. White testified that he purchased 100 used mattresses for $200 per mattress and that he resells those used mattresses for between $250 and $450.  *Id.* at 91.

  At the time of its purchase of the mattresses in October 2006, CSS did not know anything about WtC or anything about plaintiff's donating mattresses to WtC.  *Id.* at 112-13, 154.  In fact, CSS did not even know that WtC existed until CSS received notice of the temporary restraining order in February 2007.  *Id.* at 112-13.  As such, CSS did not know in October 2006 of any donation agreement between plaintiff and WtC or of any alleged fraudulent conduct by WtC.  *Id.* at 112-13, 154.

  After CSS was served with the temporary restraining order in February 2007, Peia contacted the Federal Bureau of Investigation ("FBI") regarding the mattresses that CSS had purchased from ADI.  *Id.* at 116.  The FBI informed CSS that it had not put any restrictions on CSS's mattresses.  *Id.*  Other than the interviews conducted by the FBI on February 5, 2007, CSS is not aware of the FBI's taking any other action with regard to the mattresses.

## II.  DISCUSSION

**A.     Standard Of Review**

    **1.     Objections To Report And Recommendation Of The Magistrate Judge**

The Court referred plaintiff's motion for a temporary restraining order and a preliminary injunction to the Magistrate Judge for "proposed findings of fact and recommendations for . . . disposition." 28 U.S.C. § 636(b)(1)(A)-(B); *see also* Order (Doc. # 3). "[A]ny party may serve and file written objections to such proposed findings and recommendation," and the District Judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The District Judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id*.  "[F]ailure to engage in the required de novo review is reversible error." *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (rejecting clearly erroneous standard of review).

    **2.     Preliminary-Injunction Standard**

"In determining whether to issue a preliminary injunction, [a] district court considers (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the harm to the other party; and (4) the public interest." *Straights & Gays for Equality v. Osseo Area Sch.*, 471 F.3d 908, 911 (8th Cir. 2006) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)).  While "no single factor is determinative," *Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir. 1992), "[t]he most important of the *Dataphase* factors is the [plaintiff's] likelihood

of success on the merits." *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). A district court "has broad discretion when ruling on preliminary injunctions. [The Eighth Circuit Court of Appeals] reverses only for abuse of that discretion." *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

**B.     Plaintiff Did Not Show That It Is Likely To Prevail On The Merits Against CSS And Its Employees.**

As noted, "[i]n deciding whether to grant a preliminary injunction, likelihood of success on the merits is the most significant" factor. *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995). Plaintiff did not show that it is likely to prevail on the merits of its claims against CSS and its employees. CSS objects to the Magistrate Judge's finding otherwise.

**1.     Plaintiff Did Not Link The Mattress It Donated To WtC To The Mattresses Purchased By CSS.**

Though no specific finding was made, the Magistrate Judge apparently concluded, or simply presumed, that the mattresses CSS purchased from ADI in October 2006 were from the same mattresses that plaintiff donated to WtC pursuant to the donation agreement. CSS objects to this apparent finding because plaintiff failed to establish that the mattresses CSS purchased from ADI in October 2006 came from WtC, much less that they came from the lot of mattresses that were subject to the November 2005 donation agreement between plaintiff and WtC.

Unlike the mattresses plaintiff claims it located in the possession of non-parties to this lawsuit in Kentucky, Tennessee, and Colorado, CSS's mattresses located in Booneville, Arkansas, did not have any "labels," "shipping records," or "shipping numbers" identifying them as being from the mattresses that plaintiff sent to WtC. Report & Recommendation (Doc. # 23) at 5-6.

Nevertheless, the Magistrate Judge lumped together all the mattresses found in Kentucky, Tennessee, Colorado, and Arkansas in finding as follows:

> After the donations were made, TP has presented evidence establishing a fair probability that at least a portion of the donated products were sold at various places around the country rather than put to their intended charitable use. WTC, although it claimed no knowledge of the sales, had sufficient control of the property, at least with respect to the Bowling Green Warehouse, to represent that it had moved the slippers after Cagle discovered they were being sold from that facility.

Report & Recommendation (Doc. # 23) at 13. After making findings regarding the mattresses found "at various places around the country," the Magistrate Judge next immediately defined the issue of whether CSS "was a good-faith purchaser" of the specific mattresses in Arkansas. *Id*. Thus, the Magistrate Judge apparently concluded that the mattresses CSS purchased from ADI in October 2006 were from the same mattresses that plaintiff donated to WtC pursuant to the donation agreement. *Id*.

However, plaintiff failed to demonstrate any basis for such a finding. With no "labels," "shipping records," or "shipping numbers" regarding CSS's mattresses in Arkansas, all plaintiff presented showing any link between the mattresses plaintiff donated to WtC and CSS's mattresses in Arkansas was the testimony of its employee Johnny Cagle. Cagle did not testify that he had actually seen the mattresses in Arkansas, only that he had seen "a photograph" of the mattresses from which he concluded that they "were packaged in a manner similar to those provided by Tempur-Pedic to defendants Fitzgerald and WtC for distribution to charity." Affidavit of Johnny Cagle, attached to Pl.'s Motion as Exhibit 2, at ¶ 23. Cagle's merely testifying that the mattresses he saw in a photograph were packaged in a "similar" manner to those mattresses shipped from plaintiff to WtC one year prior is not a sufficient basis for plaintiff to meet its burden of showing a link between the two sets of mattresses. "[T]enuous" evidence is "inadequate to entitle [plaintiff]

6

to preliminary relief." *Minnesota Ass'n of Nurse Anesthetists*, 59 F.3d at 83-84 (reversing district court's grant of preliminary injunction).

In any event, it was not possible for Cagle to conclude that the photograph he saw of the mattresses in Arkansas showed plaintiff's mattresses as they had been packaged and sent to WtC. The evidence was not disputed that CSS inspected, cleaned where necessary, and repackaged the mattresses at the Booneville warehouse. Transcript at 118-19, 155-56. Cagle's conclusion that CSS's mattresses were in the same shipping condition as the mattresses that had been sent to WtC was nothing more than speculation and conjecture. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) ("Likelihood of success cannot be woven from the gossamer threads of speculation and surmise."). Even so, it is not reasonable to conclude that CSS's mattresses were from the goods donated to WtC based on these observations.

Plaintiff in no way demonstrated that it is likely to prevail on the merits of its claim that the mattresses CSS purchased from ADI in October 2006 were from the same mattresses that plaintiff donated to WtC pursuant to the November 2005 donation agreement. CSS objects to the Magistrate Judge's apparent finding to the contrary. For this reason alone, plaintiff's request for a preliminary injunction against CSS should be denied.

    **2.**    **Plaintiff Did Not Meet Its Burden That CSS Was Not A Good-Faith Purchaser For Value That Has Superior Rights In The Mattresses Under Ark. Code Ann. § 4-2-403(1).**

The Magistrate Judge correctly rejected plaintiff's common-law analysis and applied the Uniform Commercial Code in determining that WtC held voidable title, not void title, to the mattresses it received from plaintiff. CSS's Resp. Br. (Doc. # 16) at 5-13; Report & Recommendation (Doc. # 23) at 10-13. Because WtC held voidable title, it could pass good title to

good-faith purchasers for value without knowledge of any alleged fraud by WtC.  Ark. Code Ann. § 4-2-403(1); *Midway Auto Sales, Inc. v. Clarkson*, 71 Ark. App. 316, 318, 29 S.W.3d 788, 790 (2000).

However, CSS does object to the Magistrate Judge's finding that plaintiff "has shown a probability that it will succeed on the merits of establishing that CSS is not a good faith purchaser for value of the mattresses."  Report & Recommendation (Doc. # 23) at 13.  Even assuming that the mattresses held by CSS are some of the same mattresses that plaintiff donated to WtC, plaintiff in no way met its burden of establishing that it is likely to prevail on the merits of its claim that CSS was not a good-faith purchaser for value without knowledge of any alleged fraud by WtC.

While the Magistrate Judge did not find that CSS had any knowledge of WtC's alleged fraud, the Magistrate Judge identified "a number of factors" that led him to find that plaintiff will likely succeed in establishing that CSS was not a *bona fide* purchaser.  *Id*. at 14.  A review of the Magistrate Judge's analysis reveals that there is not a basis to conclude that CSS was not a *bona fide* purchaser.  At the start of his analysis, the Magistrate Judge quoted a superseded definition of "good faith."  *Id*. at 13 (citing Ark. Code Ann. § 4-1-201(19)).  The Arkansas version of the Uniform Commercial Code now defines "good faith" at Ark. Code Ann. § 4-1-201(20) as "honesty in fact and the observance of reasonable commercial standards of fair dealing."  Plaintiff presented no evidence whatever that CSS was not honest in fact or that CSS failed to observe reasonable commercial standards in its purchase of mattresses from ADI.  On the contrary, CSS purchased the used Tempur-Pedic brand mattresses from ADI in October 2006 as it had been doing without incident for years.

The Magistrate Judge's first factor, that CSS purchased the mattresses for "substantially below market value," reveals nothing at all. Report & Recommendation (Doc. # 23) at 14. Of course the mattresses were purchased for below market retail value. While plaintiff sells most of its *new* individual mattresses for the *retail* price of $600 to $1,995 per mattress, *id*., CSS purchased in bulk some 4,000 *used* mattresses without covers for the *wholesale* price of $125 per mattress. The Magistrate Judge had no basis to compare what a retail customer might pay for one new mattress with CSS's spending $500,000 to purchase at wholesale 4,000 used mattresses, a number of which had stains or were otherwise in disrepair. Transcript at 155-56. As Peia acknowledged at the hearing, "[t]his is not new good clean easy to sell product." *Id*. at 157. What is more, plaintiff presented no comparison evidence of what would have been a reasonable market value price for the bulk purchase of 4,000 used mattresses. According to CSS's evidence, the price that CSS paid for the 4,000 used mattresses was consistent with other bulk purchases that CSS had made. *Id*. The price that CSS paid to ADI for the 4,000 used mattresses in no way establishes that CSS was not a *bona fide* purchaser.

It is noteworthy that the price CSS paid per mattress is consistent with what plaintiff's witness James White paid for a substantially smaller number of mattresses; Mr. White testified that he purchased 100 used mattresses for $200 per mattress and that he resells those used mattresses for between $250 and $450.[1] *Id*. at 91. There is nothing suspicious about the price CSS paid.

As the second and third factors, the Magistrate Judge found that Broco Supply's attempted resale of the mattresses was "suspicious." Report & Recommendation (Doc. # 23) at 14. What this

---

[1] Though Mr. White appears to be in a similar position to CSS, plaintiff has not named him as a defendant in this lawsuit.

has to do with CSS's prior purchase of the mattresses from ADI and whether CSS was a *bona fide* purchaser is unclear. In determining whether a purchaser is a good-faith purchaser for value without knowledge, a court is to view the purchaser at the time of the purchase, not taking into account any subsequently learned information. Ronald Anderson, Anderson on the Uniform Commercial Code § 2-403:37 (2d ed.) ("Anderson on the UCC") ("Whether a person is a good faith purchaser for value is determined as of the time that the sale is made. . . ." Subsequently learned information "does not prevent the buyer from protection under UCC § 2-403(1)."). In any event, all Broco Supply was attempting to do was satisfy the conditions established by plaintiff for the resale of its used mattresses and to comply with the requests made by plaintiff's own undercover purchaser. Transcript at 134-40.

Fourth, the Magistrate Judge found that CSS "knew [plaintiff] did not authorize the sale of used mattresses." Report & Recommendation (Doc. # 23) at 14. There was no evidence to support this finding. Rather, Peia testified that plaintiff did authorize the resale of used mattresses if certain conditions were met, such as the use of a disclaimer. Transcript at 134, 137, 161-63. CSS had abided by those conditions. *Id*. at 134, 137, 161-63. The fact that other non-authorized companies sell plaintiff's Tempur-Pedic brand mattresses, both new and used, was never refuted by plaintiff. *See, e.g.*, http://07-13-33-69.net/lib/start.cgi/surplus/thomasent/listings.html (noting in a disclaimer that ABDW, LLC, is not an authorized dealer).

Fifth, the Magistrate Judge noted that ADI's "corporate charter had been revoked," apparently for its failure to pay New Jersey franchise taxes, and that CSS should have been suspicious regarding the purchase from ADI. Report & Recommendation (Doc. # 23) at 14. There was no evidence at all that CSS knew that ADI's corporate charter had been revoked. Thus, the

Magistrate Judge placed an affirmative duty on a purchaser to investigate such things as whether a seller's corporate charter is up to date.  However, the Uniform Commercial Code makes clear that there is no such duty.  Ark. Code Ann. § 4-2-403(1) "endeavors to promote the flow of commerce by placing the burden of ascertaining and preventing fraudulent transactions on the one in the best position to prevent them, the original seller [plaintiff].  The objective of the voidable title rule is to encourage the flow of trade."  Anderson on the UCC § 2-403:8; *see also West v. Roberts*, 143 P.3d 1037, 1046 (Col. 2006) ("[T]o place the onus on the good faith purchaser to fully investigate every purchase . . . would unduly burden trade."); *Johnson & Johnson Prods., Inc. v. Dal Int'l Trading Co.*, 798 F.2d 100, 104 (3d Cir. 1986) ("The purpose of the good faith purchaser doctrine, codified in Sections 2-403 and 2-102 of the UCC, is to promote commerce by reducing transaction costs; it allows people safely to engage in the purchase and sale of goods without conducting a costly investigation. . . . The imposition on a purchaser of a duty to investigate is thus fundamentally at odds with the rationale underlying . . . the UCC.").  CSS had no duty to investigate the status of ADI's corporate charter, a company with which it had done business without problems for twelve years and from which it had purchased Tempur-Pedic brand mattresses for approximately five years without incident.

Plaintiff presented no evidence whatever that CSS had any actual knowledge that ADI had not been paying its franchise taxes or the like.  "The mere fact that there are reasonable grounds for suspicion does not prevent a purchaser from being a good faith purchaser."  Anderson on the UCC § 2-403:38 (citing *Hall v. Hidy*, 435 S.E.2d 215 (Ga. 1993)).  The Magistrate Judge was incorrect on the law; no legal authority has been cited for the proposition that a purchaser is to conduct an

investigation of a seller's corporate status, especially a seller that the purchaser has done business with for twelve years.

In any event, the revocation of a corporate charter for a failure to pay franchise taxes is no major offense; rather, the failure to pay franchise taxes is typically viewed as but a minor infraction and a nullity upon the payment of such back taxes. Ark. Code Ann. § 26-54-112(a)(1)(A) ("Reinstatement shall be retroactive to the time that the corporation's authority to do business in the state was declared to be forfeited."); N.J. Stat. Ann. § 14A:4-5(7) ("The reinstatement relates back to the date of issuance of the proclamation revoking the certificate of incorporation . . . and shall validate all actions taken in the interim."). Further, a corporation continues to exist even though it fails to pay franchise taxes. *Russell v. Dennis*, 123 B.R. 48, 50 (Bankr. W.D. Ark. 1990). It was improper for the Magistrate Judge to base his finding that CSS was not a *bona fide* purchaser on ADI's apparent corporate status, of which CSS had no actual knowledge.

Finally, the Magistrate Judge found that Peia "had previously done a web search of Scarcello (ADI) and the search revealed very negative information." Report & Recommendation (Doc. # 23) at 14. This fact is not at all relevant to whether CSS was a *bona fide* purchaser. Peia testified that he searched the internet regarding ADI *after* he was served with the temporary restraining order in February 2007, not at any time earlier. Transcript at 141. As noted, "[w]hether a person is a good faith purchaser for value is determined as of the time that the sale is made. . . ." Subsequently learned information "does not prevent the buyer from protection under UCC § 2-403(1)." Anderson on the UCC § 2-403:37. It was inappropriate for the Magistrate Judge to consider any knowledge that CSS obtained after it purchased the mattresses in October 2006.

Though the Magistrate Judge found no evidence that CSS had any knowledge of WtC's alleged fraud, the Magistrate Judge still found that CSS was not a good-faith purchaser for value. However, the Magistrate Judge's analysis does not provide adequate support for such a conclusion. This Court, in conducting its *de novo* review of the record, should find that plaintiff failed in its burden of establishing that it is likely to prevail on the merits of its claims against CSS and that plaintiff is not entitled to preliminary relief as regards CSS. CSS stands in a much different position than WtC, and CSS was the only defendant to appear and defend its title to the mattresses.

**C.     The Other *Dataphase* Factors Do Not Help Plaintiff.**

CSS objects to the Magistrate Judge's finding that "the loss to [plaintiff] by the failure to grant the injunction cannot be measured strictly in terms of monetary damages." Report & Recommendation (Doc. # 23) at 15. "Plaintiff [has] largely ignored the linchpin of injunctive relief—irreparable harm. [Plaintiff has not] clearly stated [its] theory of irreparable harm." *Jacob v. Board of Directors of the Little Rock Sch. Dist.*, Slip Copy, No. 4:06-CV-1007, 2006 WL 2792172, at *2 (E.D. Ark. Sept. 28, 2006). Plaintiff has alleged irreparable harm only in a conclusory fashion, and plaintiff presented no evidence of any alleged irreparable harm.

Presumably, the donation agreement was executed to prevent WtC from profiting from a sale of the mattresses. Thus, it seems obvious that plaintiff's damages, if any, would be whatever profits WtC realized for any unauthorized sales. Such money damages would be an adequate legal remedy. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844, 846 (8th Cir. 2003) ("When there is an adequate remedy at law, a preliminary injunction is not appropriate. . . . [S]uch a loss would be compensable in money damages."). The money damages could be given to charity or could be used to provide additional mattresses to charity. While plaintiff contends that it will suffer harm to reputation and

goodwill, it is difficult to imagine that CSS's owning and distributing 4,000 used mattresses will have any affect on plaintiff's business. Assuming that CSS's mattresses are the same mattresses that plaintiff donated to WtC, these mattresses were already placed into the marketplace by plaintiff to be distributed by parties over which plaintiff had no control.

CSS objects to the Magistrate Judge's conclusion that "[t]he harm inflicted on [plaintiff] by failing to issue the injunction would . . . far exceed the harm to CSS." Report & Recommendation (Doc. # 23) at 16. The harms to CSS will far surpass any alleged harm to plaintiff. Plaintiff is "one of the leading manufacturers and wholesalers of high-end mattresses" that was admittedly able to donate products "having a retail value of over $15 million" to charity. First Am. Compl. (Doc. # 5) at ¶ 1. CSS is a much smaller company that has invested a significant amount of its financial resources, $500,000, in purchasing 4,000 used mattresses that it hopes to be able to resell at a profit. While plaintiff already gave away the mattresses that are at issue in this litigation and took a significant tax credit, CSS will essentially be deprived of its $500,000 investment during the pendency of this action if it is included in the preliminary injunction. As noted, CSS is not in the same position as WtC; CSS was a good-faith purchaser for value from ADI and had no knowledge of WtC's alleged fraud or the donation agreement.

What is more, the fact that the harm to CSS will far surpass any alleged harm to plaintiff is evident in plaintiff's decision to only selectively prosecute those re-sellers whom it believes has possession of the mattresses originally donated to WtC. For instance, Mr. White purchased 100 mattresses from ADI, but plaintiff has elected not to name Mr. White as a defendant in this lawsuit. Transcript at 91.

CSS objects to the Magistrate Judge's conclusion that the public interest favors entering a preliminary injunction against CSS. Report & Recommendation (Doc. # 23) at 16. While plaintiff argues that the public interest will be served by granting a preliminary injunction, this factor pertains to WtC, not CSS. CSS had no knowledge of plaintiff's donating mattresses to WtC for charitable purposes and no knowledge of the donation contract. The fact remains that plaintiff was a subsequent *bona fide* purchaser, and a segment of the population will benefit from CSS's distributing its used mattresses in the marketplace.

### D.     In The Alternative, The Court Should Increase The Security Amount.

CSS objects to the Magistrate Judge's recommendation that plaintiff be required to post a bond of only $500,000. *Id*. If the Court grants plaintiff's request for a preliminary injunction against CSS (and it should not), the Court should require plaintiff to post security of at least $1.6 million with regard to CSS alone. As noted, CSS paid $500,000 for its 4,000 mattresses, and CSS anticipates realizing a significant profit on the sale of those mattresses. Transcript at 121. A bond of only $500,000 would not even cover the interest between now and trial on the $500,000 that CSS has paid for the 4,000 mattresses. CSS also objects to the bond amount because the Magistrate Judge "did not make any . . . findings in this regard nor did [he] give reasons for selecting the [$500,000] amount." *Bebe Stores, Inc. v. May Dep't Stores Int'l*, 313 F.3d 1056, 1058 (8th Cir. 2002). The decision on the bond was therefore erroneous.

### III.  CONCLUSION

In making its *de novo* review of the show-cause hearing, the Court should find that plaintiff has not demonstrated that it is likely to prevail on the merits of its claim that CSS's mattresses are the same mattresses that plaintiff donated to WtC. The Court should also find that plaintiff has not

met its burden of demonstrating that it is likely to prevail on the merits of its claim that CSS was not a good-faith purchaser for value of mattresses from ADI. Plaintiff has no evidence that CSS was not a good-faith purchaser for value with knowledge of any fraudulent conduct. CSS stands in a much different position than WtC, and CSS and its employees should not be included in any preliminary injunction.

> E. B. Chiles IV, Ark. Bar No. 96179
> QUATTLEBAUM, GROOMS,
>   TULL & BURROW PLLC
> 111 Center Street, Suite 1900
> Little Rock, Arkansas 72201
> telephone: (501) 379-1700
> facsimile: (501) 379-1701
> cchiles@qgtb.com
>
> QUATTLEBAUM, GROOMS,
>   TULL & BURROW PLLC
> 4100 Corporate Center Drive, Suite 310
> Springdale, Arkansas 72762
> telephone: (479) 444-5205
> facsimile: (479) 444-6647
> bcate@qgtb.com
>
>
> By: _____/s/ Brandon B. Cate_____
>        Brandon B. Cate, Ark. Bar No. 2001203
>
> *Attorneys for Close Out Surplus and Savings, Inc.*

## **CERTIFICATE OF SERVICE**

       I hereby certify that on March 22, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

**Jason T. Browning**
jbrowning@warnersmith.com cnix@warnersmith.com

**Rex W. Chronister**
rexchronister@yahoo.com

**David L. Dunagin**
dldunagin.law@sbcglobal.net paralegal-paul@sbcglobal.net;cmecfiling-usdc@yahoo.com

**Robert Ashley Frazier**
rfrazier@warnersmith.com dlawrence@warnersmith.com

**Mark P. Rankin**
mrankin@carltonfields.com lvizzi@carltonfields.com

                                        /s/ Brandon B. Cate
                                       Brandon B. Cate