IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS

FORT SMITH DIVISION

TEMPUR-PEDIC

INTERNATIONAL, INC.                                                                                    PLAINTIFF

     v.                                    Civil No. 07-2015 WASTE

TO CHARITY, INC.;

BROCO SUPPLY, INC.; JACK
FITZGERALD; ERIC VOLOVIC;
HOWARD HIRSCH; THOMAS
SCARELLO; NELSON SILVA; CLOSE
OUT SURPLUS AND SAVINGS, INC.,
and ERNEST PEIA                                                                                        DEFENDANTS

**RESPONSE TO DEFENDANTS JACK FITZGERALD, WASTE TO
CHARITY, INC., CLOSE OUT SURPLUS AND SAVINGS, INC., AND ERNEST PEIA'S
OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

       On February 14, 2007, Plaintiff Tempur-Pedic International, Inc. ("Tempur-Pedic") filed a motion for temporary restraining order (TRO) and preliminary injunctive relief which was assigned to United States Magistrate Judge James R. Marschewski. After reviewing the requested order and supporting papers, Magistrate Marschewski issued a TRO, pending a hearing on the motion, and set a surety bond in the amount of $200,000.

       On March 5, 2006, Magistrate Marschewski held a hearing on the motion. Plaintiff called the following witnesses: (1) Johnny Cagle; (2) Keith Moore; (3) James White; (4) Stanley Campbell and (5) Ronald Crenshaw. Defendant Ernie Peia was the sole defense witness.

       On March 8, 2007, Magistrate Marschewski issued a recommendation that the preliminary injunction be granted. Magistrate Marschewski correctly applied what have come to be known as the *Dataphase* factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc), citing *Minnesota Mining and Mfg. Co. v.*

*Rauh Rubber, Inc.,* 130 F.3d 1305, 1307 (8th Cir.1997); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 485-86 (8th Cir.1993). The Court also recommended that Tempur-Pedic increase the bond amount to $500,000.[1] Tempur-Pedic has satisfied this Court directive.

On March 21 and 22, 2007, defendants (1) Jack Fitzgerald and Waste To Charity, Inc. ("WTC") and (2) Ernest Peia, Nelson Silva and Close Out Savings and Surplus, Inc. ("CSS") respectively, filed objections to the Magistrate's Report and Recommendation. This Memorandum is submitted in response to those objections and in particular, now that a transcript of the hearing is available, to present to the Court the complete factual record on which the Report and Recommendation are made.

## BACKGROUND

Tempur-Pedic is in the bedding business. Tempur-Pedic has a proprietary foam technology called "Tempur material" used in the manufacture of mattresses, pillows, slippers and other medical and comfort products worldwide. (Trans. at pp. 8-9; RR at p. 2[2].) Tempur-Pedic markets and distributes its product through a network of authorized and approved retail distributors. *Id*. Each mattress model references the Tempur-Pedic® mark in its name. *Id*.

Tempur-Pedic devotes time and expense to market its brand and trademark. (Trans. at p. 9.) New mattresses sold in the ordinary course of business by authorized Tempur-Pedic distributors are enclosed in a hypo-allergenic cover, sealed in a plastic bag, and packed in cardboard boxes labeled with the Tempur-Pedic's registered trademarks. (Trans. at pp. 7-8; RR at p. 2.) Goods designated for charitable donations are packaged differently. *Id*. These mattresses do not include the hypoallergenic cover and are not boxed in the cardboard boxes. *Id*. Instead, the mattresses are wrapped in clear plastic, stacked on wooden pallets, and then the entire load is wrapped in another layer of heavy-duty plastic. *Id*.

New Tempur-Pedic slippers and pillows are packed in display cartons and then in cardboard boxes marked with Tempur-Pedic's registered trademarks. (RR at p. 2.) Donated pillows are removed from their retail packaging and placed in large pallet size cartons and encased in plastic wrap prior to shipment. *Id*. Donated slippers or foot comforters remain in their original packaging and cardboard boxes and are

---

[1] No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction. *See Sanborn,* 997 F.2d at 486; *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.,* 815 F.2d 500, 503 (8th Cir.1987).
[2] "Trans" designates reference to the transcript of the March 5, 2007 TRO hearing before Magistrate Marschewski and "RR" designates reference to the Magistrate's Report and Recommendation, dated March 8, 2007.

2

palletized and wrapped in plastic wrap before shipping. *Id*. The donated slippers at issue in this case were discontinued items that would only have been available as charitable products. *Id*.

Tempur-Pedic operates an annual campaign for donating goods to charity and has donated mattresses, pillows and other products to charitable relief. (Trans. at p. 6.) After the Hurricane Katrina national disaster, Tempur-Pedic marshaled a significant portion of its inventory to benefit Gulf Coast residents impacted by that disaster. *Id*. In 2005, Tempur-Pedic decided to make a donation of approximately $15 million in mattress, slipper, and pillow inventory to Gulf Coast residents victimized by Hurricane Katrina. (RR at p. 2.)

On November 14, 2005, as part of its corporate relief efforts, Tempur-Pedic entered into a written Charitable Donation Agreement (Plaintiff's Exhibit 1) with Jack Fitzgerald and his company, WTC, to distribute mattresses, slippers, and pillows. (Trans. at pp. 10-14; RR at p. 2.)

Pursuant to the Charitable Donation Agreement, defendants Fitzgerald and WTC were given a limited interest in donated product. They were not given title or authorization to sell the property. (Trans. at pp. 11-14, 38.)

Specifically, the Charitable Donation Agreement provided that:

1. All products donated by Tempur-Pedic **are not to be resold**, distributed for sale, or otherwise sold for profit in any venue.

2. All products donated by Tempur-Pedic are not covered by any warranties.

3. **All products donated** by Tempur-Pedic are to be **clearly identified as products manufactured by Tempur-Pedic** in any promotional materials associated with the donation. (Emphasis added.)

4. All products donated by Tempur-Pedic are not to be used or portrayed in a disparaging way or otherwise portrayed in a negative light.

5. Should **you wish to dispose of the Tempur-Pedic Products** or any of them, you will notify us and give us an opportunity to retrieve them or designate their disposition, and you will comply with any reasonable request from us for their disposition. (Emphasis added.)

(Trans. at pp. 10-14; RR at pp. 2-3; Plaintiff's Exhibit 1.) (Copies of all plaintiff and defendant exhibits introduced into evidence at the hearing, for the convenience of the court, are attached hereto.)

Tempur-Pedic made approximately 50 deliveries of donated goods to WTC. (RR at p. 3; Plaintiff's Exhibit 12.) After these deliveries were made, Tempur-Pedic learned that the donated products were not being provided to Hurricane Katrina victims but were instead being sold for profit in violation of the terms of the Charitable Donation Agreement.

3

Specifically, Tempur-Pedic was informed of unauthorized individuals or entities offering Tempur-Pedic mattresses, pillows, and to a lesser degree slippers, for sale. (Trans. at p. 18; RR at p. 3.)

For example, in October of 2006, Johnny Cagle, Tempur-Pedic's Director of Internal Audit, was informed by an authorized dealer that Tempur-Pedic mattresses were being sold from a truck parked in the Green Hills area of Nashville, Tennessee. (Trans. at p. 18; RR at p. 4.) At about the same time, a customer service employee of Tempur-Pedic received a complaint that a man named "Robert" or "Bobby Anastario," representing US Warehousing in Bowling Green, Kentucky ("Bowling Green Warehouse"), was trying to sell one or more truckloads of Tempur-Pedic mattresses for $30,000 and that additional Tempur-Pedic mattresses were being sold in Nashville, Tennessee. (Trans. at pp. 18-20; RR at p. 4.)

On October 17, 2006, Cagle contacted Fitzgerald about the mattresses being offered for sale by Broco Supply Inc. (Trans. at p. 21; RR at p. 5.) Fitzgerald indicated he used the Bowling Green Warehouse for storage of donated slippers but did not know that they were being sold for profit. (Trans. at p. 22; RR at p. 5.) Fitzgerald also stated he did not know anything about the facility being used for storage of Tempur-Pedic mattresses. *Id.* Fitzgerald indicated he would arrange to have the slippers moved out of the Bowling Green Warehouse and later provided proof of delivery of the movement. *Id*.

In early October of 2006, Cagle learned from Wes Williams, an authorized Tempur-Pedic distributor, that a male who identified himself as Eric Volovic from Broco Supply, a building material wholesaler/importer, operating in Mechanicsburg, Pennsylvania, offered to sell Williams 3,300 Tempur-Pedic mattresses for $295 per mattress. (Trans. at p. 21; RR at p. 5.) Tempur-Pedic mattresses, depending on size and style, retail for between $699 and $6,399 per mattress. (RR at p. 5.) During negotiations regarding Volovic's original offer, Williams was told that someone within Tempur-Pedic was inquiring about the mattresses and Volovic could not sell them at that time. (Trans at p. 61; RR at p. 5.)

Volovic provided Tempur-Pedic's consultant, Keith Moore, with a photograph of the mattresses. (Trans. at pp. 51-52; RR at p. 5.) Cagle was able to determine the mattresses were part of those provided to WTC for distribution to charity. (RR at p. 4.)

In November of 2006, Cagle learned that 70 Tempur-Pedic mattresses were given to a QuickDrop store in Highland Ranch, Colorado, and were for sale on eBay. (Trans. at p. 22; RR at p. 6.) Cagle was able to determine from the shipping records that the mattresses being offered for sale were from the supply provided to WTC pursuant to the Charitable Donation Agreement. (Trans. at pp. 22-25; RR at p. 6.)

4

At the hearing Cagle testified that the number on the label (Plaintiff's Exhibit 3) did in fact correspond with shipping number 11201853. This shipping number is assigned to a shipment of 70 mattresses of various sizes given to WTC on July 28, 2006 and represented to have been given to Hope Ministries. (Plaintiff's Exhibit 6, p. 5.)

Approximately eight weeks after Volovic made the initial offer to sell 3,300 Tempur-Pedic mattresses to Moore, Volovic offered to sell 3,000 Tempur-Pedic mattresses to Moore. (Trans. at pp. 60-61; RR at p. 6.) Volovic conditioned the offer on the following demands, each consistent with an effort to hide from Tempur-Pedic the sale of these mattresses: (1) an agreement not to sell any of the purchased products in the continental United States (Trans. at pp. 48-50; Plaintiff's Exhibit 9); and (2) the signing of a non-disclosure agreement requiring that Moore not discuss the sales transaction. (Trans. at pp. 46-47; Plaintiff's Exhibit 8.) Volovic also told Moore that he had received instructions from Tempur-Pedic that all tags must be removed from the mattresses and they were not to list Tempur-Pedic as the manufacturer or identify the mattresses as new. (Trans. at pp. 50-51; RR at pp. 6-7; Plaintiff's Exhibits 11, 12 and 13.) Tempur-Pedic did not provide any such instruction or authorization to Broco Supply. (Trans. at p. 51.)

Further, Volovic refused to reveal where the mattresses were located until he received a down payment. (Trans. at pp. 52-54; RR at p. 7.) Volovic initially demanded a down payment of $100,000 but this was eventually reduced to $10,000. *Id.* After the down payment was made by wire transfer, Volovic revealed the mattresses were stored in a warehouse facility located at 560 West 2nd Street, Booneville, Arkansas. *Id.* After the storage location was identified, Tempur-Pedic contacted law enforcement authorities in Arkansas. (Trans. at p. 56; RR at p. 7.)

On February 5, 2007, Moore went to Booneville and at 1:00 p.m. Volovic arrived at the Booneville Warehouse. (Trans. at pp. 54-57; RR at p. 7.) Volovic was accompanied by Howard Hirsch, Nelson Silva, and Thomas Scarcello. *Id*.

Inside the warehouse, Moore inspected hundreds of pallets containing what appeared to be Tempur-Pedic mattresses with hypo-allergenic covers removed that were palletized and wrapped in the same manner as those supplied to WTC. (Trans. at p. 55; RR at p. 7.) The mattress inventory included over 2,500 mattresses. Upon inquiry, Moore was told the missing mattresses were being stored in a warehouse in Fort Smith, Arkansas. (Trans at pp. 55-56; RR at p. 7.) While Moore was inside the

5

warehouse, Volovic, Hirsch, Scarcello, and Silva were separated and interviewed by the Federal Bureau of Investigation (FBI). (Trans. at pp. 56-57; RR at p. 7.)

Moore later interviewed David Ems, the owner of the QuikDrop in Highland Ranch, Colorado, and Bobby Anastario of the Bowling Green Warehouse in Bowling Green, KY. From those interviews Moore learned that Jack Fitzgerald and WTC were the source of supply of the Tempur-Pedic mattresses that were being sold for profit at those locations. (Trans. at pp. 62-67.) Through his investigation, Moore also learned that defendants Ernie Peia and CSS dealt with defendants Tommy Scarcello and Action Distributors Inc. ("ADI"). (Trans. at p. 73.) Defendant Peia himself testified that on October 12, 2006 CSS purchased 4000 Tempur-Pedic mattresses from Tommy Scarcello for $500,000. (Trans. at pp. 113-115; RR at p. 8.)

After learning that ADI had control over 800 South 4th Street in Fort Smith, Arkansas and 732 Elm Street in Paris, Arkansas, Moore did a visual surveillance of each location. (Trans. at p. 74.) At ADI's facility at Fort Smith, Moore observed and recorded semi-haulers, both tractors and trailers. *Id.* In the process, Moore developed compelling proof of how the mattresses donated by Tempur-Pedic to charity were instead diverted by defendants Fitzgerald and WTC to defendants Scarcello and ADI so they could be resold for profit. Moore recorded the markings on the door panels of the tractors and the numbers assigned to the trailers in the ADI yard (Trans. at p. 75.) Moore then compared those identifying marks to the bills of lading (Plaintiff's Exhibit 12) and observed that these vehicles, collectively, were used to transport five or six of the truckloads of Tempur-Pedic mattresses contained in the allotment entrusted to defendants Fitzgerald and WTC during the calendar year 2006. These loads were taken directly from the Tempur-Pedic warehouse in South Carolina and were the subject of the Charitable Donation Agreement which exclusively gave authorization to Fitzgerald and WTC to donate them to charity.

Defendant Peia testified that he is President of CSS and has for 12 years been in the business of buying and selling merchandise across the country and the world. (Trans. at pp. 110-111.) Peia further stated that he and CSS have done business with Scarcello and ADI for 15 years and that he has met and has spoken with Tony Alamo on two occasions. (Trans. at pp. 111-112, 141.) While his testimony was clearly self-contradictory on this topic, Peia did admit that he knew that the prices for new Tempur-Pedic mattresses ranged between $699 and $7,000 a mattress. Peia in his testimony admitted to purchasing the mattresses directly from ADI in the Booneville, Arkansas warehouse. (Trans. at pp. 113-115, 122.) He

6

also stated that even though he now knows that the mattresses were to be donated to charity he wants Tempur-Pedic to pay him ten percent of the full $15 million of inventory that Tempur-Pedic donated, or $1.5 million. (Trans. at pp. 160-161.) At one point in his testimony, Peia even stated that representatives from Broco told him they were trying to get covers for the mattresses so they could be sold as "real." (Trans. at pp. 139-140.) When pressed to identify who at Broco wanted to get the telltale covers that accompany a retail sale, Peia then claimed that it was "customers" who came up with this proposal. (Trans. at p. 140.) Peia did not identify the "customers" by name.

Contrary to defendants CSS, Peia and Silva's unsupported claim, Tempur-Pedic was not aware that they were engaged in selling Tempur-Pedic mattresses. None of these defendants are authorized distributors and their involvement in the unauthorized sale of used Tempur-Pedic mattresses only became known as a result of the company's investigation.

## DISCUSSION

While keeping the applicable standard in mind, Magistrate Marschewski accurately analyzed whether Tempur-Pedic had established by the evidence presented at the hearing a likelihood of success on the merits.[3] As Magistrate Marschewski correctly observed, Tempur-Pedic "was not required to prove a mathematical (greater than fifty percent) probability of success on the merits." Citing *Heartland Acad. Cmty. Church v. Waddle,* 335 F.3d 684, 690 (8th Cir. 2003). Rather, it is a question of whether Tempur-Pedic has a "fair chance of prevailing" after discovery and a full trial. *Id. Citing Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.")

Magistrate Marschewski is correct, the Uniform Commercial Code applies to all "transactions in goods." Ark. Code Ann. § 4-2-102. A purchase is defined to include "taking by sale ... gift, or any other voluntary transaction creating an interest in property." Ark. Code Ann. § 4-1-201(32). *Neuhoff v. Marvin Lumber and Cedar Co.,* 370 F.3d 197 (1st Cir. 2004).

---

[3] A district court sitting in diversity jurisdiction applies the conflict of law rules for the state in which it sits." *DCS Sanitation Management, Inc.* v. Casillo, 435 F.3d 892 (8th Cir. 2006). The parties have assumed that Arkansas law applies. As the court believes the provisions of the Uniform Commercial Code (UCC) are applicable, and Arkansas has adopted the UCC the court need not for purposes of this motion decide the choice of law question.

Section 4-2-403 "recognizes a legal distinction between a sale of stolen goods and a sale of goods procured through fraud." *Midway Auto Sales, Inc. v. Clarkson,* 71 Ark. App. 316, 318, 29 S.W.3d 788 (2000). As noted by the court in *Midway Auto Sales,* "[a]bsent exigent circumstances, one who purchases from a thief acquires no title as against the true owner.  However, under section 4-2-403, the result is different when property obtained by fraud is conveyed to a bona fide purchaser." *Id.* (citation omitted).

Section 4-2-403 in applicable part provides as follows:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer **except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased**.  A person with voidable title has power to transfer a good title to a good faith purchaser for value.  When goods have been delivered under a transaction of purchase the purchaser has such power even though  (Emphasis added.)

(a) the transferor was deceived as to the identity of the purchaser; or

(b) the delivery was in exchange for a check which is later dishonored; or

(c) it was agreed that the transaction was to be a "cash sale"; or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Ark. Code Ann. § 4-2-403.[4]

Magistrate Marschewski also correctly recommended that CSS and Ernest Peia are not good-faith purchasers.  Defendant CSS, Peia and Silva's reference to the recently enacted Arkansas statute defining "good faith" at Ark. Code Ann. § 4-1-201(20) as "honestly in fact and the observance of reasonable commercial standards of fair dealing," is of no moment particularly given the detail reasoning offered by Magistrate Marschewski in his Report and Recommendations.  Clearly the grounds cited by the court in determining that there is a likelihood that plaintiff will be able to demonstrate that these defendants are not good faith purchasers satisfies the recently modified definition as well.  After giving careful consideration to the documentation submitted to the court in connection with the motion for TRO and/or preliminary injunction, the response filed by CSS, the testimony of the witnesses at the hearing, and the arguments of counsel, Magistrate Marschewski correctly concluded that Tempur-Pedic demonstrated a probability that it will succeed on the merits of establishing that CSS is not a good faith purchaser for value of the mattresses.

---

[4] Recognizing that the granting or referral of a temporary injunction does not constitute and final decision on the merits of either party's legal claims, *see Benson Hotel Corp v. Woods*, 168 F.2d, 698 (8th Cir. 1948), Tempur-Pedic respectfully maintains that defendants Jack Fitzgerald and WTC, because of the limiting language of the Charitable Donation Agreement, did not receive even voidable title. *Beverage Products Corp v. Robinson*, 27 Ark. App. 225, 769 S.W.2d 424 (Ark. Crt. App. 1989); *see also Buck v. Gillham,* 80 Ark. App. 375, 96 S.W. 3d 750 (2003).

Without question, the magistrate's analysis is completely persuasive and accurate. As Magistrate Marschewski correctly points out, the price of the mattresses was substantially below market value. The average price per mattress paid by CSS was $125. (Defendant's Exhibit 1)  Cagle testified that the value of these mattresses would be substantially above that figure and that some of these mattresses could go from $600 and up. Even Mr. Peia acknowledged that the range of Tempur-Pedic mattresses, on the web page would go from $600 to $6,999 and, by his own admission, he was going to make $2.5-3 million on his $500,000 investment.[5]  Second, the terms of the purported sale were suspicious: all tags had been removed; while the mattresses were confirmed to be Tempur-Pedic mattresses they could not be sold as such; no sales could be made to Tempur-Pedic dealers; there was a restriction to only sell the mattresses outside the U.S. and there was a false representation that Tempur-Pedic itself had confirmed the mattresses would not have tags on them a claim flatly refuted at the hearing. Third, both the timing of the attempted sales and the use of Broco Supply, a building material supplier, lends support to the conclusion that CSS was not a good faith purchaser for value. Fourth, Peia, the president of CSS, acknowledged that he knew Tempur-Pedic did not authorize the sale of used mattresses. Fifth, the corporate charter of ADI had been revoked both before and during the relevant period of time. (Plaintiff's Exhibit 14.)  In addition, Michael H. Lowe was listed as the Agent for the defunct ADI corporation in New Jersey.  This is the same individual that was operating the fork lift at the Boonville warehouse according to the testimony of Chief of Police Stanley Campbell. Sixth, the length and nature of Peia's transactions with Tony Alamo and Scarello (both buying and selling goods for 15 years, and the availability of information concerning Alamo on the internet from Scarello) all offer sufficient basis to conclude, for the purposes of the hearing, that Peia had negative information about Scarello. *Citing e.g., Gentry v. Alley,* 228 Ark. 236, 240, 306 S.W.2d 695 (1957) (non-UCC case; "[I]f he had notice of circumstances that ought to have put a prudent business man upon inquiry, and he failed to make inquiry, he was not an innocent purchaser.")

Magistrate Marschewski also correctly concluded that Tempur-Pedic has shown a threat of irreparable harm if the injunction does not issue. At the hearing, Tempur-Pedic demonstrated that money damages are not adequate to compensate it for the loss of the donated products. By definition Tempur-Pedic's object in donating the products is not remuneration but effectuating its charitable intent. Moreover

---

[5] At another point in his testimony, Peia claimed he was going to pay defendant Broco Supply $630,000 (Trans at P. 159) which would have reduced his profit.

its goodwill and reputation will be harmed by the sale of these goods at below-marked rates by unauthorized dealers who are untrained, do not understand the dynamics of "Tempur material," who provide no warranty or trained support.

Magistrate Marschewski further correctly determined that the loss to Tempur-Pedic by the failure to grant the injunction cannot be measured strictly in terms of monetary damages as suggested by CSS. *See e.g., Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 420 (8th Cir. 1987)(a party has not shown irreparable harm if its alleged injuries can be remedied in a suit for money damages). Nor are the damages to Tempur-Pedic purely speculative. *See e.g., Minn. Ass 'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,* 602 F.2d 150, 154 (8th Cir. 1979)("[T]he speculative nature of the threatened harm support[s] the denial of injunctive relief."). *See also Blue Moon Entertainment, LLC v. City of Bates,* 441 F.3d 561, 564 (8th Cir. 2006)("[T]he failure of a movant to show irreparable harm is an independently sufficient basis upon which to deny a preliminary injunction.") As noted by the Magistrate, Tempur-Pedic expends substantial resources and efforts aimed at controlling the quality of its product and the distribution through a network of authorized dealers. A donation to charity designed to provide assistance to victims of Hurricane Katrina does not put in danger these efforts or impact Tempur-Pedic's relationship with its authorized dealers. However, the sale of Tempur-Pedic products under the circumstances in this case does put those relationships and efforts in jeopardy and also defeats Tempur-Pedic's donative intent. Based upon all of the evidence presented to date, Tempur-Pedic has shown threat of irreparable harm.

Further, Magistrate Marschewski correctly balanced the harm to the non-moving party through issuance of the injunction. Without question, by imposition of the injunction CSS is prohibited from selling or otherwise disposing of the mattresses. Nonetheless, the harm inflicted on Tempur-Pedic by failing to issue the injunction, as correctly observed by the Magistrate, would far exceed the harm to CSS. Any monetary harm potentially inflicted on CSS can also be alleviated by the requirement that Tempur-Pedic be required to post adequate security for issuance of the injunction.

Finally, the Magistrate correctly recommends that the public interest favors the issuance of the injunction. While "the public interest is not ordinarily implicated by concerns related to business reputation," *Coca-Cola Co. v. Purdy,* 382 F.3d 774, 789 (8th Cir. 2004) (recognizing public interest in avoiding the danger of consumer deception in a case involving use of Internet domain names likely to confuse and divert Internet users from their intended online destinations), there are broader issues here

including protecting a network of authorized dealers, Tempur-Pedic's registered trademarks, avoiding consumer deception, protecting Tempur-Pedic's donative intent, as well as ensuring that donated goods reach those they are intended for.  There is a likelihood that the mattresses in question are those specifically designated for charitable donation to the victims of Hurricane Katrina.  Under the circumstances of this case, clearly the public interest favors the granting of the motion for preliminary injunction.

## CONCLUSION

For the reasons set forth above, the Report and Recommendation of Magistrate Judge Marchewski should be endorsed and sustained in its entirety.

DATED this 26th day of March 2007.

>BINGHAM MCCUTCHEN, LLP
>Edward F. Maluf
>Daniel M. McGillycuddy
>399 Park Avenue
>New York, NY  10022-4689
>(212) 705-7000
>(212) 752-5378 (fax)
>
>
>By:___/s/Daniel McGillycuddy_____
>     Daniel M. McGillycuddy
>
>
>                             and
>
>
>WARNER, SMITH & HARRIS, PLC
>Jason T. Browning (AR Bar # 98151)
>Robert A. Frazier (AR Bar # 2004125)
>400 Rogers Avenue
>P.O. Box 1626
>Fort Smith, AR  72902-1626
>(479) 782-6041
>(479) 479-782-0841 (fax)
>jbrowning@warnersmith.com
>rfrazier@warnersmith.com
>
>*Attorneys for Tempur-Pedic International, Inc.*

**CERTIFICATE OF SERVICE**

       I hereby certify that on March 26, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

**E.B. Chiles IV**
cchiles@ggtb.com

**Rex W. Chronister**
rexchronister@yahoo.com

**David L. Dunagin**
dldunagin.law@sbcglobal.net paralegal-paul@sbcglobal.net;cmecfiling-usdc@yahoo.com

**Robert Ashley Frazier**
rfrazier@warnersmith.com dlawrence@warnersmith.com

**Mark P. Rankin**
mrankin@carltonfields.com lvizzi@carltonfields.com


       /s/Daniel McGillycuddy
       Daniel M. McGillycuddy, NY Bar No. 1733062
       BINGHAM MCCUTCHEN, LLP
       399 Park Avenue
       New York, New York 10022
       Telephone:  (212) 705-7486
       Fax:  (212) 752-5378

NYDOCS/1287249.1/0999992-0000982002